UNITED STATES

v.

Airman First Class Brian D. NEAL,
FR305–90–7807 United States
Air Force.

ACM 30733.

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 20 May 1993.

Decided 14 Oct. 1994.

Appellate Counsel for Appellant: Captain Richard D. Desmond (argued), Colonel Jay L. Cohen, Lieutenant Colonel Frank J. Spinner, and Captain Robert E. Watson.

Appellate Counsel for the United States: Major Jules D. Silberberg (argued) and Colonel Jeffery T. Infelise.

Before HEIMBURG, YOUNG, and PEARSON, Appellate Military Judges.

## OPINION OF THE COURT

YOUNG, Judge:

Appellant pled guilty to wrongful appropriation of $1260 from his roommate. Court members convicted him of larceny of that money, larceny of military property valued at over $9,000, and dereliction of duty for keeping weapons in his dormitory room. Articles 121, 92, UCMJ, 10 U.S.C. §§ 921, 892 (1988). The court members sentenced appellant to a bad-conduct discharge, confinement for 4 months, forfeiture of $200 pay per month for 4 months, and reduction to E–1. Appellant assigns two errors: (1) the military judge erred in refusing to suppress the military property introduced at trial; and (2) even if the search were legal, the affidavit used to support the search authorization was misleading. After considering the briefs and oral argument * of the parties, and the record of trial, we find error in the admission of the military property, except the night vision goggles, and reassess the sentence.

### I. Standard of Review

■ Normally, our duty to review search authorizations is limited to ensuring "that the [military magistrate] 'had a substantial basis for ... conclud[ing] that probable cause existed.'" *United States v. Figueroa*, 35 M.J. 54, 56 (C.M.A.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1257, 122 L.Ed.2d 655 (1993) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)). "However, we review warrantless searches de novo." *United States v. Pabon*, 37 M.J. 836, 839

* We heard oral argument in this case at the United States Air Force Academy, Colorado Springs, Colorado, on 27 September 1994.

(A.F.C.M.R.1993). We, usually, will accept the military judge's findings of fact, as to what matters were presented to the search authority, unless they are unsupported by the evidence of record or clearly erroneous. *See United States v. Burris,* 21 M.J. 140, 144 (C.M.A.1985). Of course, we may also exercise our statutory authority to review the military judge's findings of fact and conclusions of law de novo. Article 66(c), UCMJ, 10 U.S.C. § 866 (1994). We have elected not to adopt the findings of the military judge.

## II. Facts

Senior Airman Collins and appellant shared two dormitory rooms separated by a bathroom: one room (# 116) was used as a living room; the other (# 117) was used as a bedroom. Before departing for temporary duty in Somalia, Airman Collins gave appellant five pre-signed checks, with the payee and amount left blank, to pay his share of joint telephone and cable television bills. When he returned, Airman Collins discovered appellant had cashed all five checks, but had not paid the bills.

Airman Collins took the matter to their commander and requested a separate room. The commander agreed the roommates should be separated, one in room # 116 and the other in room # 117. The commander directed Captain Sneeder to supervise the move, mediate any disputes over property, and prevent a fight. On 11 February 1993, Captain Sneeder went to the rooms, where he was admitted by Airman Collins. Captain Sneeder and Airman Collins waited a while for appellant, but when he did not appear, they went into room # 117 to see what property belonging to Airman Collins needed to be moved into room # 116. Captain Sneeder noticed considerable military gear in the room, including flight suits, rucksacks, a helmet used for parachute jumps, Danner boots, running shoes, and two pairs of Solo Arctic boots. It was not unusual to see military gear in the rooms as squadron personnel were frequently getting ready to depart for or just returning from a deployment or special training, and the squadron commander had given squadron members authorization to maintain individual field gear in their residences and to transport government equipment off base in their private vehicles. The Solo boots attracted Captain Sneeder's attention because there was a shortage of these boots in the squadron, and they were supposed to be turned back in as soon as training was completed so that others could use them. Captain Sneeder had recently undergone training without such boots because of the shortage. In response to Captain Sneeder's questions, Airman Collins told him both pairs of boots were appellant's, as were the other items of military gear observable in appellant's wall-locker—appellant had left the doors to the lockers wide open. Concerned that some of the equipment may be military property in excess of appellant's needs, Captain Sneeder decided to inventory the items.

Each of the rooms contained two wall lockers. The lockers were approximately 6 feet tall and 3 feet wide and contained shelves. A cubbyhole with a lift-up door was located above, and separate from, each locker. The door to the cubbyhole was activated by a trigger-switch inside the locker. The door remained closed unless held open. Airman Collins insisted that the lockers in room # 117 were appellant's, the lockers and cubbyholes in room # 116 were his, and that he had told Captain Sneeder as much. At the time of trial, Captain Sneeder was under the impression that appellant had a wall locker in each of the rooms and that the cubbyhole he searched in room # 116 belonged to appellant.

Airman Collins consented to have Captain Sneeder check his (Collins') lockers, but he was uncomfortable with Captain Sneeder searching through appellant's lockers without appellant being present. Captain Sneeder claimed that, as an officer, he was authorized to conduct an inventory; Airman Collins assisted Captain Sneeder under protest. One of the drawers in appellant's locker in room # 117 was partially open and Captain Sneeder observed what looked to be part of a rapelling rope. Although this was not unusual, because squadron members were given pieces of such rope to practice knot tying, Captain Sneeder knew the squadron was missing two of these $300 ropes. He had

Airman Collins open the drawer further. (Airman Collins insists that the drawer was fully closed when he opened it.) It revealed two full size rapelling ropes and an MX–300 radio. Captain Sneeder noticed that there were two pairs of Danner boots and two pairs of New Balance running shoes on the floor and two Danner boot boxes and one New Balance running shoe box in appellant's locker. Each member is provided two pairs of Danner boots, but Captain Sneeder knew that appellant should have been wearing one of his two pairs. Each member is provided one pair of running shoes, but could draw an additional pair when the issued pair became worn. Captain Sneeder picked up the boxes. By their weight, he was able to determine the boxes contained objects. When he opened them, he found two pairs of unused boots and one pair of unused running shoes.

Captain Sneeder asked if appellant kept any of his belongings in room # 116. Airman Collins explained that appellant had considerably more clothes and things than he did, so he let appellant share one of the cubbyholes with him. Captain Sneeder asked Airman Collins if he minded him looking through the cubbyhole. Airman Collins voluntarily consented to Captain Sneeder looking into his cubbyhole and opened it for him. Inside was a container for night vision goggles. Captain Sneeder knew the squadron was missing two or three pairs of these goggles. Captain Sneeder removed the container from the cubbyhole and opened it; inside, he found the head piece supports, but no goggles. He recorded the serial number from the container to match it against squadron records. These night vision goggles cost over $6,000 and were supposed to be carefully controlled by the squadron.

The following week, Captain Sneeder reported to the commander what he had found. The commander directed Captain Sneeder to open appellant's squadron locker and inventory the equipment therein to compare against the list of items Captain Sneeder had compiled in the dormitory. The squadron lockers were secured by a lock provided by the squadron, the combination of which was kept on file by the squadron. All squadron personnel were aware that these lockers were subject to being opened by squadron personnel needing pieces of equipment or making sure that no hazardous materials were kept there. During the inventory of appellant's squadron locker, Sergeant Secor told Captain Sneeder he had loaned his Solo boots to appellant. Appellant evidently wore the same size as Sergeant Secor, had not been issued the correct size boots because of the supply shortage, and Sergeant Secor was no longer going on the deployment. Captain Sneeder also sought out information from squadron records to show what items were missing and what items appellant was authorized to have in his possession. He was informed that the squadron inventories indicated appellant had not signed out any special equipment. Captain Sneeder was provided a list of property missing from the squadron which included the night vision goggles with the same serial number he had observed on the container in appellant's room, and several MX–300 radios.

On 17 February 1993, Captain Sneeder reported his findings to the Security Police. He signed a statement, under oath, that he believed appellant had items in his room which had not been properly checked out of the squadron. This affidavit failed to mention that the squadron commander had authorized personnel to keep individual field gear in their living quarters, that Sergeant Secor had explained the reason appellant possessed two pairs of Solo boots, or that some of Captain Sneeder's findings resulted from unlawfully opening boxes and lockers in appellant's room. Shortly thereafter, Airman Collins provided a signed, sworn statement to the Security Police confirming the presence of those items in appellant's room as late as 1700 on 15 February 1993. A military magistrate issued a search authorization to search appellant's room (# 117) for, among other things, the night vision goggles, the MX–300 radio, 9 mm ammo clips, and all other government issue property identified as squadron property (the Solo Arctic boots were not listed) which appellant was not authorized to have in his possession. The search party also searched unsuccessfully for the night vision goggles and container in room # 116, although the military magistrate had not authorized a search of that room. A

large number of items were seized from room # 117, but neither the container nor the night vision goggles was found. Some time after the seizure of these items from appellant's room, other squadron members returned a diver's watch and the night vision goggles and container.

Appellant was charged with stealing over $12,000 worth of government property. The court members convicted appellant, by exceptions, of larceny of the night vision goggles, a radio, a pager, a dive watch, and ammunition, but acquitted him of stealing all of the items which could easily be purchased in the local community, such as boots, running shoes, rapelling ropes, and desert battle dress pants.

### III. Discussion

At trial, appellant moved to suppress all of the evidence as the fruits of an illegal search. He claimed the search authorization was based on Captain Sneeder's illegal searches into his squadron locker and dormitory wall locker, and, if that evidence were excluded, and omitted information had been included, no reasonable military magistrate could have concluded that probable cause to search existed.

After extensive findings of fact, the military judge concluded that all the items Captain Sneeder observed in appellant's locker, with the exception of the rapelling ropes which were in plain view, were observed as the result of an illegal search; appellant did not have a reasonable expectation of privacy in his squadron locker; the military magistrate had a substantial basis for determining probable cause when the tainted information from the illegal search of appellant's room locker was excised from the affidavit; and there was probable cause to believe the night vision goggles and other government property were in appellant's room and were evidence of a crime. The military judge also found that the evidence was not seized by the Security Police as a result of an unlawful search or seizure, that the evidence would have been obtained even if the unlawful search and seizure had not been made, and that the evidence was obtained by officials who reasonably and with good faith relied on the issuance of an authorization to search and seize.

During the testimony before the court members, the defense asked to reopen the suppression motion because some of the witnesses' testimony did not match the facts stipulated for the motion or the testimony on the motion. The military judge conducted another suppression hearing and found by clear and convincing evidence that Airman Collins had authority to consent to a search of the cubbyhole where the container for the night vision goggles was found and that he had consented to Captain Sneeder's search of it. She confirmed her finding of a good faith exception.

Appellant contends the evidence seized under the search authorization was derived from Captain Sneeder's illegal search of appellant's dormitory room. He claims Captain Sneeder did not have valid consent to search, the items were not in plain view, the "good faith" exception did not apply to either search, and the search authorization was improper because Captain Sneeder recklessly disregarded the truth in his supporting affidavit.

■ We start by reviewing Captain Sneeder's original entry into appellant's dormitory room and his subsequent examination of appellant's belongings. Captain Sneeder was present in appellant's room, at the direction of the squadron commander, to effect a peaceful separation of appellant from Airman Collins and his belongings. We find Captain Sneeder's presence was lawful—appellant's "reasonable expectation of privacy in the barracks is limited by the need for military discipline and readiness." *United States v. McCarthy,* 38 M.J. 398, 402 (C.M.A. 1993) (citing *United States v. Middleton,* 10 M.J. 123, 128 (C.M.A.1981)). Although members of the squadron were authorized to store individual equipment items in their living quarters, and some of the items of military gear could be purchased outside government channels, it was not unreasonable for Captain Sneeder to suspect that appellant was not authorized to have two pairs of Solo boots and the quantity of other military gear which was in plain view. The question then becomes whether, having these suspicions,

Captain Sneeder was legally entitled to open drawers and boxes in appellant's locker.

For the first time on appeal, the government argues that Captain Sneeder's actions were more in the nature of an inspection or inventory, under MIL.R.EVID. 313, which did not require probable cause or a search authorization. The government asserts Captain Sneeder was authorized, perhaps even had a duty, to examine appellant's belongings once he suspected that appellant inappropriately possessed military gear, the absence of which, at least for the Solo Arctic boots, had an impact on the ability of the unit to perform its mission.

An inspection is an examination of all or part of a unit, organization, or installation, conducted as an incident of command, the primary purpose of which is to ensure the security, military fitness, or good order and discipline of the unit, organization or installation. MIL.R.EVID. 313(b). Evidence obtained from inspections and inventories conducted under MIL.R.EVID. 313 is admissible if relevant and not otherwise inadmissible. *Id.* If the primary purpose of the examination is to gather evidence for use in disciplinary proceedings, it is not a valid inspection under MIL.R.EVID. 313, and the evidence is not admissible in a trial by court-martial. The drafters of the rule suggest that "any individual placed in a command or appropriate supervisory position may inspect the personnel and property within his or her control." S. SALTZBURG, L. SCHINASI & D. SCHLUETER, MILITARY RULES OF EVIDENCE MANUAL 299, 302 (3d ed. 1991).

■ While the government's inspection theory is not without some appeal, we are unwilling to adopt it in this case; the record fails to establish that Captain Sneeder's primary purpose in conducting the inspection was not to gather evidence for disciplinary proceedings. Therefore, we will review Captain Sneeder's conduct under the search and seizure rules.

■ Evidence obtained as a result of an unlawful search or seizure by a government agent is inadmissible against an accused who has a reasonable expectation of privacy in the place searched. MIL.R.EVID. 311(a); *United*

*States v. Britton,* 33 M.J. 238, 239 (C.M.A. 1991). An expectation of privacy exists when the accused manifests an actual or subjective expectation of privacy and when that expectation is one that society recognizes as reasonable. *Id.* (citing *Smith v. Maryland,* 442 U.S. 735, 740–41, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979)). Evidence obtained from a reasonable search of government property is admissible at trial even without probable cause, unless, at the time of the search, the person to whom the property was issued or assigned had a reasonable expectation of privacy therein.

> Wall or floor lockers in living quarters issued for the purpose of storing personal possessions normally are issued for personal use; but the determination as to whether a person has a reasonable expectation of privacy in government property issued for personal use depends on the facts and circumstances at the time of the search.

MIL.R.EVID. 314(d). We question whether appellant had a reasonable expectation of privacy in a locker located in a common area which was left with its doors wide open. *See United States v. Battles,* 25 M.J. 58 (C.M.A. 1987) (accused did not have reasonable expectation of privacy in berthing area on naval vessel or in an unsealed and open box with accused's name on it located within the vessel's common spaces). Nevertheless, since the issue was not fully litigated at trial, and the military judge found that appellant did have a reasonable expectation of privacy, we will accept that appellant did have a reasonable expectation of privacy in his room locker. Thus, Captain Sneeder's suspicions did not give him the lawful authority to go into appellant's locker, open boxes, or search through drawers.

■ Contrary to the military judge's findings, we believe that Captain Sneeder was not lawfully authorized to have Airman Collins open the drawer in which the rapelling ropes were found. Although Captain Sneeder knew two such ropes were missing, he could see no more than would lead him to suspect appellant had a short portion of rope distributed to squadron members to practice their knot tying. He had to have probable cause to believe the rope was evidence of a

crime before he could lawfully have Airman Collins open the drawer. MIL.R.EVID. 316(d)(4)(C); *see Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) (without probable cause, police officers lawfully in apartment could not move stereo items to check serial numbers to confirm suspicions that property was stolen); *United States v. Van Hoose,* 11 M.J. 878 (A.F.C.M.R.1981) (pre-MIL.R.EVID. case in which seizure of evidence under plain view doctrine should have been suppressed as no probable cause to believe that it was evidence of a crime), *pet. denied,* 12 M.J. 301 (C.M.A. 1981).

■ The search of the cubbyhole, however, is a different story. The evidence supports the military judge's finding that this was Airman Collins' cubbyhole, but he shared it with appellant. The government proved by clear and convincing evidence that Airman Collins had the authority to, and did, voluntarily consent to Captain Sneeder looking through the cubbyhole. *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *United States v. Camanga,* 38 M.J. 249, 251–52 (C.M.A.1993). Thus, Captain Sneeder was authorized to move things around in the cubbyhole and take the serial number off of the container for the night vision goggles. We reject appellant's contention that persons conducting a valid consent search are prohibited from moving or examining objects under the *Arizona v. Hicks* rationale. Furthermore, we conclude that Captain Sneeder's search of the cubbyhole was not derived from his unlawful search of the contents of appellant's locker; rather, it was prompted by his observation of numerous items of government property in plain view.

■ The commander's decision to have Captain Sneeder inventory the contents of appellant's *squadron* locker was sound. Under the circumstances, appellant could not reasonably expect privacy in the *squadron* locker from an intrusion by his squadron commander seeking squadron property. MIL.R.EVID. 314(d); *United States v. Muniz,* 23 M.J. 201, 205–06 (C.M.A.1987).

■ That brings us to the validity of the search authorization. Did the military magistrate have probable cause to believe that evidence of a crime was located in appellant's room? And, was the magistrate's decision, that probable cause to search existed, tainted by misrepresentations and omissions? To answer these questions, we must know what information was before the military magistrate. Under certain circumstances, we might be willing to infer that the military magistrate saw the affidavit and the authorization. We find it impossible to do so, however, when the "affidavit" was neither signed nor sworn to, it is unclear whether the affidavit was tendered to the military magistrate or is an after-the-fact summary of what the affiant told the military magistrate, there is no evidence as to whether the military magistrate discussed the evidence with a judge advocate, and both parties specifically acknowledged at trial that they had no idea what information the military magistrate had before him when he determined probable cause to search existed. Thus, we are unable to find the military magistrate had a substantial basis for concluding that probable cause existed. *Figueroa,* 35 M.J. at 56. Therefore, all evidence seized as a result of the search authorization must be suppressed. MIL.R.EVID. 311(a).

■ By suppressing the fruits of the search pursuant to the search authorization, we are still left with two items of evidence: (1) the night vision goggles; and (2) a diver's watch. Senior Airman Hutchins, another dormitory resident and one of appellant's acquaintances, saw appellant with the night vision goggles and borrowed them for his personal use. Sometime after Captain Sneeder saw the container for the night vision goggles, but before the issuance of the search authorization, appellant gave the container for the night vision goggles and the diver's watch to Airman Hutchins to store for him. Airman Hutchins and his roommate, Airman First Class Zachary, departed the base for temporary duty the following day. Two weeks later when they returned, they were unable to find either the night vision goggles or the watch. They informed the first sergeant what happened. A few days later, they found the night vision goggles and the diver's watch in their room and turned them in. The serial number on the night vision goggles matched both the number Captain Sneeder took off the container in

appellant's room and the serial number for a pair of night vision goggles for which the squadron supply custodians could not account. However, we are not convinced the diving watch admitted at trial was either military property or the same watch appellant gave to Airmen Hutchins and Zachary. Therefore, we affirm appellant's guilt of specification 2 of Charge I only as it relates to the larceny of night vision goggles, of a value of about $6,000.

## IV. Sentence Reassessment

Having set aside a part of the findings of guilty to specification 2 of Charge I, we must try to determine what the sentence would have been absent the error. *United States v. Sales,* 22 M.J. 305, 307 (C.M.A. 1986). If we can determine what sentence probably would have been adjudged, we may do so; otherwise, we must return the case for a rehearing. *United States v. Jones,* 39 M.J. 315, 317 (C.M.A.1994); *United States v. Peoples,* 29 M.J. 426 (C.M.A.1990). If we are able to determine the sentence which probably would have been adjudged, we then must decide whether that sentence is nevertheless appropriate. *Peoples,* 29 M.J. at 428; *Sales,* 22 M.J. 305 (C.M.A.1986).

After weighing the rather small relative difference between the value of the items appellant was convicted of stealing (over $9,000) and the value of just the night vision goggles ($6,000), and considering the sentence adjudged, we are confident that the court members would have adjudged the same sentence. We have given individualized consideration to the seriousness of the offense, the character and military performance of appellant, and all circumstances documented in the record of trial. *United States v. Snelling,* 14 M.J. 267 (C.M.A.1982). We find the sentence is not inappropriate.

The findings, as modified, and sentence are correct in law and fact, and on the basis of the entire record are AFFIRMED.

Senior Judge HEIMBURG and Judge PEARSON concur.