## COMMONWEALTH *vs.* PETER CONTOS.

Middlesex. May 11, 2001. - September 4, 2001.

Present: MARSHALL, C.J., GREANEY, SPINA, SOSMAN, & CORDY, JJ.

*Homicide. Practice, Criminal,* Capital case, Instructions to jury, Assistance of counsel, Psychiatric examination, State of mind, Voluntariness of statement. *Witness,* Expert. *Evidence,* Expert opinion, State of mind, Voluntariness of statement, Admissions and confessions. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Search and Seizure,* Military reservation.

At the trial of indictments charging murder in the first degree, the judge properly declined to instruct the jury on voluntary manslaughter, where the only evidence to support a finding of reasonable provocation was hearsay evidence, admitted through an expert witness as the basis for the expert's opinion and not for its probative value. [22-23]

The Commonwealth's failure to schedule a court ordered psychiatric examination of a criminal defendant through defense counsel did not deprive the defendant of his right to counsel in violation of the Sixth Amendment to the United States Constitution or art. 12 of the Declaration of Rights of the Massachusetts Constitution, where defense counsel was aware of the order for, and the purpose of, the examination. [23-26]

At a criminal trial, the judge did not err, in the circumstances, by permitting the Commonwealth, over the defendant's objection, to offer expert opinion testimony regarding the defendant's ability to plan and form a specific intent. [26-27]

Statements made by a defendant in response to questions by police, following his unambiguous request for counsel ("I think I'm going to get a lawyer"), were obtained in violation of the defendant's Miranda rights and in the absence of a voluntary, knowing, and intelligent waiver of his right to counsel [27-31]; however, the admission of the statements in evidence at the defendant's criminal trial was harmless error beyond a reasonable doubt, where the statements were merely cumulative of other evidence the Commonwealth had obtained at the time the statements were made [31-32].

A Superior Court judge properly denied a criminal defendant's motion to suppress physical evidence discovered in the course of a military health and safety inspection of his locker, where the search was a proper inspection search by military authorities and was not conducted primarily as a law enforcement mechanism, and where, in any event, the defendant did not have a reasonable expectation of privacy in his locker, which was used to store government property and which was located in a government building used strictly for the performance of official duties. [35-37]

INDICTMENTS found and returned in the Superior Court Department on November 5, 1997.

Pretrial motions to suppress evidence were heard by *Maria I. Lopez,* J., and the cases were tried before *Robert A. Barton,* J.

*Stephen Hrones* for the defendant.

*Marguerite T. Grant,* Assistant District Attorney *(Richard D. Grundy,* Assistant District Attorney, with her) for the Commonwealth.

SPINA, J. The defendant was convicted on three indictments charging murder in the first degree on a theory of deliberate premeditation. The victims were a woman, Catherine Rice, with whom the defendant had an affair, and their two young children, Benjamin Rice, four years old, and Ryan Contos, two months old. On appeal the defendant claims error in (1) the failure to give a voluntary manslaughter instruction; (2) the allowance of the Commonwealth's motion for a psychiatric evaluation of the defendant after the defendant said he was not advancing an insanity defense and after counsel announced he did not want the Commonwealth's psychiatrist to interview the defendant; and (3) the denial of his motions to suppress (a) statements he made to police and (b) physical evidence, in this case, the bodies of the children, discovered in the course of a military search of the defendant's gear locker for improperly stored ammunition. The defendant also asks us to grant a new trial in accordance with our power under G. L. c. 278, § 33E. We affirm the convictions and decline to order a new trial or otherwise grant relief under G. L. c. 278, § 33E.

1. *Background.* The facts are largely undisputed. Catherine Rice was found dead in her Lowell apartment on Saturday, September 27, 1997. She had been strangled to death with a ligature, and left nude in her bathtub in a few inches of water. Her two children, Benjamin and Ryan, were missing. Their bodies were discovered early the next morning stuffed in a knapsack located in a locker assigned to the defendant at Otis Air Force Base (base) on Cape Cod. The boys also were strangled.

The defendant was a traditional guardsman[1] in the Air

---

[1]Traditional guardsmen work one weekend a month and two weeks in the summer.

National Guard (ANG) at the base. He met the victim while working as a Sears security guard in 1992. Soon after meeting they developed a sexual relationship that continued, albeit intermittently, until the night of her death. Benjamin was born in June, 1993. Ryan was born in July, 1997. Meanwhile, the same year he met Rice, the defendant also became involved with his future wife, Robyn. In 1994, the defendant moved in with Robyn; they married in August, 1996. During this period, the defendant bragged to at least one coworker that having a girl friend and a wife made him feel like a "king." He told no one, however, that he had children.[2]

Details of the murders are based exclusively on the defendant's hearsay statements to his expert witness, a psychologist. It appears that after working Friday night, September 26, the defendant went to Rice's home in Lowell. He arrived around 1 A.M.[3] They had sexual intercourse and talked. The defendant told her that he wanted to settle the paternity question by having blood tests done on himself and the boys. He also told her that he wanted her to stop contacting him and that their relationship was over. Rice and the defendant argued. Each time they seemed to reach a resolution, the defendant claimed, Rice became "hysterical" and the argument started all over again. Finally, Rice declared that she "was going to handle it in her own way, that she was going to go see Robyn the next day and that she was going to settle this and get him back in her own way." He believed Rice was going to reveal his relationship with her and the existence of his two children to his wife and thereby end his marriage. This caused the defendant to "snap" and go into what he described to his expert as "the zone," in which he reverted to his military training and eliminated anyone he perceived as a threat. He strangled Rice and the two boys.

---

[2] In 1995, at Rice's request, the defendant signed an acknowledgment of paternity of Benjamin. Although he visited Rice at the hospital after Ryan was born he did not acknowledge his paternity of Ryan. DNA tests confirmed that the defendant was the father of both boys.

[3] The sound of the defendant's military boots had, over the years, become familiar to Irene Finneral, Rice's upstairs neighbor, and had signaled his presence downstairs. Finneral testified that when the defendant visited Rice, he typically arrived around midnight Friday night and left early Saturday morning.

He put the boys' bodies in a bag and drove to the base. When they were discovered in the defendant's gear locker at the base, the bodies were inside a plastic bag that had been placed inside a knapsack that was itself enclosed with a plastic bag.

The day after the murders, Irene Finneral, Rice's upstairs neighbor, landlord, and friend, became concerned by the silence downstairs. Rice's car was in the driveway, but the shades were drawn in her apartment and there was no sign or sound from the children. Around 6 P.M., after calling Rice's parents to express her concern, Finneral and her son entered Rice's apartment and discovered her body.

2. *Voluntary manslaughter instruction.* The defendant claims error in the judge's failure to give an instruction on voluntary manslaughter. The defendant's account of the crimes was introduced during the defendant's direct examination of his expert witness. The judge repeatedly instructed the jury (and counsel at sidebar) that the defendant's statements to his expert witness were only to be considered as "bases of any opinion that the doctor may testify to . . . and [could not] be treated as evidence of the truth of the matters contained within those [statements]." At the charge conference, the judge ruled that, where the only information that might support a finding of reasonable provocation was hearsay evidence, the defendant was not entitled to a voluntary manslaughter instruction. The judge's ruling was correct.

An instruction on voluntary manslaughter should be given "if there is evidence of provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool." *Commonwealth v. Seabrooks*, 425 Mass. 507, 514 (1997). However, where, as here, the sole source of facts upon which the defendant relies to show provocation is hearsay evidence admitted through an expert witness as the basis for that expert's opinion and not for its probative value, the defendant is not entitled to an instruction on voluntary manslaughter. See *Commonwealth v. Donahue*, 430 Mass. 710, 717-718 (2000) (approving instructions to jury that statements were admissible "only as they relate to the basis of the doctor's opinion of the defendant's mental condition . . .

[and] could not be considered as evidence of premeditation, extreme atrocity or cruelty, or specific intent to kill"); *Commonwealth* v. *Kappler*, 416 Mass. 574, 576 n.1 (1993). Cf. *Commonwealth* v. *Sires*, 413 Mass. 292, 299-300 (1992). There was no error.

3. *Blaisdell issues.* The defendant argues that it was error to permit the Commonwealth's expert to testify because the Commonwealth scheduled the court ordered psychiatric examination without notice to defense counsel. He claims that because the Commonwealth failed to notify counsel he was deprived of "the assistance of his attorney[] in making the significant decision of whether to submit to the examination" in violation of his rights under the Sixth Amendment to the United States Constitution and art. 12 of the Declaration of Rights of the Massachusetts Constitution.[4] See *Estelle* v. *Smith*, 451 U.S. 454, 471 (1981); *Commonwealth* v. *Trapp*, 423 Mass. 356, 359, cert. denied, 519 U.S. 1045 (1996). See also Mass. R. Crim. P. 14 (b) (2), 378 Mass. 874 (1979); *Blaisdell* v. *Commonwealth*, 372 Mass. 753, 768 (1977) (defendant may refuse to submit to court ordered examination). Although the defendant's original objections to the examination were on other grounds, he preserved his appellate rights by timely post-examination motions. Hence we review to determine if the failure to schedule the examination through defense counsel violated the Sixth Amendment and art. 12, and, if so, whether it was harmless beyond a reasonable doubt. *Commonwealth* v. *Vinnie*, 428 Mass. 161, 162, cert. denied, 525 U.S. 1007 (1998).

On December 24, 1998, three weeks before trial was set to begin and almost one year after the reciprocal discovery order deadline had passed, the defendant informed the court that although he was not raising a defense of lack of criminal responsibility, he planned to call an expert witness who would testify as to the defendant's state of mind as it affected the degree of guilt. The Commonwealth promptly filed a motion requesting a *Blaisdell* examination of the defendant.

On January 4, 1999, fifteen days before trial, a hearing was

---

[4]The defendant does not argue, and we do not consider, whether in this context art. 12 affords a defendant greater protection than the Sixth Amendment.

held on the Commonwealth's motion. At that hearing, the defendant argued that, because he would not be raising the defense of a lack of criminal responsibility, the Commonwealth had no right to a psychiatric examination and the judge had no authority to order the defendant to submit to one. See Mass. R. Crim. P. 14 (b) (2); *Blaisdell* v. *Commonwealth, supra.* Although counsel conceded that the defendant's ability to form a specific intent to kill or premeditate was a live issue, he insisted that his expert would not offer an opinion but would provide only "background information" sufficient to permit the jury to decide the issue.[5] Counsel further asserted that he would not "turn [his] client over" to an examination and that if the judge granted the Commonwealth's motion, he would appeal the order to the single justice of this court.[6] Over these objections, the motion judge (who was also the trial judge) ordered the *Blaisdell* examination.[7]

Dr. Alison Fife, the Commonwealth's expert, examined the defendant six days later on January 10, 1999. During the final pretrial hearing held on January 12, 1999, defense counsel, who had not spoken with the defendant after the judge issued the *Blaisdell* order on January 4, learned that the examination had already taken place. Defense counsel claimed that, given his strong objections to the judge's authority to issue the order and his assertion that he would not permit his client to undergo the examination, he believed the Commonwealth would not schedule the examination without contacting him. He argues that, as in *Estelle* v. *Smith, supra* at 459, the Commonwealth's

---

[5]The judge reconfirmed that the defendant's ability to form a specific intent to kill was a live issue at trial after the defense expert testified and prior to the judge's permitting the *Blaisdell* examiner to testify.

[6]No such appeal was filed.

[7]On appeal, the defendant does not press his claim that *Blaisdell* v. *Commonwealth,* 372 Mass. 753 (1977), only authorizes the court to order a psychiatric examination if the defendant raises the defense of lack of criminal responsibility. As he correctly concedes in his brief, *Commonwealth* v. *Diaz,* 431 Mass. 822, 830 (2000), clarified that *Blaisdell*'s holding is not limited to its facts. The policy justifying reciprocal discovery when the defendant places his statements and mental state in issue applies with equal force to an alleged inability to premeditate or form a specific intent to kill as it does to the lack of criminal responsibility defense raised in *Blaisdell.* See *Commonwealth* v. *Stockwell,* 426 Mass. 17, 21 (1997). Cf. *Commonwealth* v. *Harvey,* 397 Mass. 803, 807-808 & n.2 (1986).

failure to notify counsel prior to scheduling the examination deprived the defendant of his right to counsel and that it was therefore error for the judge to permit Dr. Fife to testify.

The circumstances in which the examination in *Estelle* v. *Smith, supra,* was conducted, and the use to which the fruits of the examination were put, are readily distinguishable. In that case, on the basis of the court ordered, purportedly neutral pretrial competency examination conducted without defense counsel's knowledge, the examining doctor was called to testify during the penalty phase of the trial. The defendant had not been warned that the examination was not confidential and defense counsel first learned of the judge's informal, oral appointment of the doctor and the letter he filed with the court during jury selection. See *id.* at 458 n.5. The doctor was the State's only witness at trial and he gave a damaging opinion regarding the defendant's lack of remorse and his future dangerousness. *Id.* at 459-460. The Supreme Court held that the lack of notice to defense counsel regarding the use to which the examination would be put, and the failure to provide an opportunity for the defendant to discuss with counsel whether, in those circumstances, it was advisable to submit to the examination, violated the defendant's Sixth Amendment right to counsel at a critical stage in the criminal process. See *id.* at 470-471.

By contrast, here there was no misconduct in the Commonwealth's failure to notify counsel because counsel was aware of the order for the examination and the purpose of the examination. Defense counsel was on notice that an examination would occur imminently because of the upcoming trial, particularly where the time constraint under which the Commonwealth was required to act was due to defense counsel's delay of almost one year in giving his own notice of a mental state defense. Moreover, counsel's contention that he expected that the Commonwealth would not schedule an evaluation in light of his clear assertion that he would not permit his client to submit to such an examination is disingenuous. Counsel must have been aware that to preserve its right to move to exclude the defendant's expert's testimony based on the defendant's refusal to cooperate, the Commonwealth was required to

schedule the examination.[8] See *Blaisdell* v. *Commonwealth, supra* at 769. There was no error.

The defendant next contends that the judge erred by permitting the Commonwealth, over objection, to offer expert opinion testimony where the defendant's expert did not even give opinion testimony, at least on direct examination. Although the defendant refused to discuss the crime with Dr. Fife, she relied, as she was entitled to do, on the testimony of the defendant's expert for statements of the defendant. See *Blaisdell* v. *Commonwealth, supra* at 765-766. Dr. Fife opined, based on statements the defendant made to his expert, that the defendant "had the ability to plan and form a specific intent." The prosecutor elicited a statement from the defendant's own expert to the effect that she was unable to form an opinion as to the defendant's ability to form a specific intent, deliberately premeditate, or control and understand his actions because, in her view, he suffered from no mental disease or defect that could have impaired any such ability.

The Commonwealth generally relies on the "presumption of sanity" and does not offer expert testimony on the issue of sanity or "diminished capacity" in the vast majority of cases. See *Commonwealth* v. *Kostka*, 370 Mass. 516, 530 (1976). It is not precluded, however, from offering such testimony, even if the defendant does not raise the issue. *Blaisdell* is not to the contrary. Its significance is simply that "a defendant who seeks to put in issue his statements as the basis of psychiatric expert opinion in his behalf opens to the State the opportunity to rebut such testimonial evidence in essentially the same way as if he himself had testified [and require him to] . . . submit to [a] psychiatric examination so that the jury may have the benefit of countervailing expert views." *Blaisdell* v. *Commonwealth, supra* at 766. The defendant's use of an expert whom he did not call on to express an opinion did not prevent the Commonwealth from eliciting an opinion from the defendant's expert or from its own expert on the defendant's state of mind (a subject the defendant introduced). The defendant's decision to offer what

---

[8]The defendant in fact refused to speak about the crimes with the Commonwealth's expert. The judge recognized that because of this refusal, he had discretion under *Blaisdell* to exclude the defendant's expert's testimony.

amounted to a hearsay confession through his expert in order to avoid being subjected to cross-examination, and to imbue with professionalism his self-diagnosis of having "snapped" and gone into "the zone," was a tactical decision, the consequences of which cannot be used now to support a claim that his constitutional rights were violated. There was no error.

4. *Suppression of statements.* The defendant claims that it was error to admit an inculpatory statement made after he invoked his right to counsel. The motion judge found that the defendant's statement, "I think I'm going to get a lawyer," was sufficiently ambiguous that the police officers' continued questioning of the defendant was proper. We conclude that this ruling was clearly erroneous, but that the error was harmless beyond a reasonable doubt.[9]

Based on information provided by Rice's upstairs neighbor at the scene of the crime, the Lowell police contacted the base in an effort to locate the defendant and inform him that his "wife" was dead and his children were missing. Military personnel, confused because they were under the impression that he had no children, contacted the defendant at his home in Stoneham. He, in turn, called the Lowell police. A State trooper, accompanied by a Lowell police officer, drove to the defendant's home. The defendant consented to a cursory search of his home for the children, and he then agreed to drive in his own car to the Lowell police department to be questioned. He arrived at the police station at approximately 9:30 P.M. At 1 A.M., after several hours of questioning, which did not result in a confession, he was placed under arrest.

The motion judge found that the questioning by the police in this case was a custodial interrogation, see *Commonwealth* v. *Magee*, 423 Mass. 381, 385 (1996), and that Miranda warnings were required. The judge also found that the defendant was read his rights and signed a valid Miranda waiver both before the interview and at the start of the taped interview. We accept the judge's findings on these matters.

---

[9]Because of our conclusion that admission of the defendant's statement made after he invoked his Fifth Amendment right to counsel was a violation of his rights under the Fifth Amendment, we do not reach the defendant's claim that his right to remain silent was violated by the failure to cease questioning after he stated simultaneously that he wanted "to stop."

During the first interview,[10] the defendant said that he had spoken to Rice earlier that week to check in and see how she was. Initially, he maintained that it had been approximately six months since he had been in Lowell at Rice's apartment and he repeatedly denied being there the night before despite being told that witnesses saw him leave the apartment that morning. When the police suggested that he might have driven to Rice's apartment but immediately left, he abruptly changed his story and agreed that that was what happened. He said that he slept for a few hours after finishing his shift at the base Friday night and then, on the spur of the moment, he decided to drive to Lowell. He left the base around 4:30 A.M. Saturday morning and arrived at Rice's apartment at 6 A.M. The defendant told the police that Rice was an early riser, so although he had not told her he was coming, he "figured" that she would be awake and they could have a cup of coffee together. When he arrived, the door was locked. No one answered when he knocked, so he turned around and drove back to the base. He steadfastly denied having gone into the apartment.

One and one-half hours into the interrogation, the following exchange took place.

*Q.:* "What happened in that house?"

*A.:* "I didn't see or hear anything in that house."

*Q.:* "But you went in?"

*A.:* "I think at this point we need to stop."

*Q.:* "Why do we need to stop?"

*A.:* "I think we're going to stop, and *I think I'm going to get a lawyer.*[11] [Emphasis added.] If this is the way this is going, you're either accusing me or charging me."

---

[10]The motion judge found that there were three interviews. She properly allowed the defendant's motion to suppress the second and third interviews as they were made after an attorney called and was permitted to speak to the defendant. See generally *Commonwealth* v. *Mavredakis*, 430 Mass. 848 (2000).

[11]Whether the defendant said, "I'm going to get a lawyer" or "I think I'm going to get a lawyer" was a point of dispute because at that moment, a trooper was speaking at the same time as the defendant. The transcription of the tape reflects the defendant's assertion that he said, "I'm going to get a lawyer." The two State troopers present in the room testified that they heard the defendant say, "I think I'm going to get a lawyer." We have reviewed the tape, and conclude that the motion judge's finding that the defendant said, "I think I'm going to get a lawyer" is not clearly erroneous.

*Q.*: "I'm not charging you. I'm asking you what happened."
*A.*: "Okay. Well, at this point, we're going to stop."
*Q.*: "Okay; 12:04, September 28th."
*A.*: "Go ahead, you can stop."

[The defendant gestured to the tape recorder.]

*Q.*: "You don't want to talk anymore? You don't want to talk on tape?"
*A.*: "I want to talk off tape."
*Q.*: "You want to talk off tape?"
*A.*: "I have questions I would like to ask."
*Q.*: "Okay. We can talk off tape."
*A.*: "Yes."
*Q.*: "Okay."

The tape recorder was turned off for two minutes. When the tape was turned back on, questioning resumed. The police clarified that the defendant had agreed to continue talking. While the machine was off, the defendant had admitted arriving somewhat earlier in the morning and having entered the apartment.

We disagree with the motion judge's conclusions that the statement, "I think I'm going to get a lawyer," was ambiguous, and that the continued questioning of the defendant was a reasonable attempt to clarify his ambiguous or equivocal request for an attorney. When a suspect in custody makes an unequivocal and unambiguous request for counsel, all questioning must cease. See *Edwards* v. *Arizona*, 451 U.S. 477, 484-485 (1981); *Commonwealth* v. *Brant*, 380 Mass. 876, 882, cert. denied, 449 U.S. 1004 (1980). Questioning may continue, however, where the request for counsel is equivocal or ambiguous. See *Davis* v. *United States*, 512 U.S. 452, 461-462 (1994); *Commonwealth* v. *Judge*, 420 Mass. 433, 450 (1995). Cf. *Commonwealth* v. *Sarourt Nom*, 426 Mass. 152, 158 (1997).

In these circumstances, the phrase, "I think I'm going to get a lawyer," was an unambiguous invocation of the defendant's right to counsel. "In normal parlance, this . . . phraseology is an acceptable and reasonable way to frame a request." *State* v. *Dumas*, 750 A.2d 420, 425 (R.I. 2000) (in context presented, "Can I get a lawyer?" was unequivocal request for lawyer). In

addition, and in contrast to the motion judge's findings, the police did not attempt to clarify this purportedly equivocal request for an attorney. The defendant's mention of a lawyer went unanswered and police focused instead on the defendant's additional statement that he wanted "to stop." Finally, in the circumstances presented here, it not clear whether an attempt to seek clarification of the request for counsel would have been constitutional, even if the request had been ambiguous. See *Commonwealth* v. *Sarourt Nom, supra* (although not prejudicial in circumstances presented, "in ordinary circumstances, there would be no proper basis for an interrogator's asking a suspect his reason for requesting an attorney").

Statements obtained following an invocation of the right to counsel are presumed involuntary unless the Commonwealth proves beyond a reasonable doubt that the defendant "initiate[d] further communication, exchanges, or conversations with the police," *Edwards* v. *Arizona, supra,* and thereby voluntarily, knowingly, and intelligently waived his right to counsel. *Commonwealth* v. *Rankins,* 429 Mass. 470, 473 (1999). *Commonwealth* v. *Judge, supra* at 448. The Commonwealth has failed to prove that the defendant waived his right to counsel.

Assuming without deciding that the motion judge's finding that the defendant's gesture toward the tape recorder rendered his desire "to stop" ambiguous, there is nothing before us to support a conclusion that this gesture, without more, constituted a voluntary, knowing, and intelligent waiver of his right to counsel. In addition, given the police officers' failure to acknowledge the defendant's request for an attorney, the defendant's willingness to continue talking to the police following his request for counsel did not constitute a valid waiver. See *Edwards* v. *Arizona, supra* at 484 ("valid waiver of [the] right [to counsel] cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights"). Cf. *Commonwealth* v. *Corriveau,* 396 Mass. 319, 331 (1985) (right to counsel was waived where, after stating "[i]t's beginning to sound like I need a lawyer," defendant was offered telephone and defendant stated, "I don't want a lawyer"); *Commonwealth* v. *Pennellatore,* 392 Mass. 382, 387 (1984) ("I guess I'll have to have a

lawyer for this," was not request for counsel particularly where defendant refused officer's urging to telephone someone for assistance); *Commonwealth* v. *Richmond*, 379 Mass. 557, 559 (1980) (right to counsel waived, where after stating "I think I should get a lawyer," defendant declined police offer of telephone and he continued to ask police questions). The statements the defendant made following his request for counsel should have been suppressed as they were obtained in violation of his Miranda rights and in the absence of a voluntary, knowing, and intelligent waiver of his right to counsel. See *Edwards* v. *Arizona, supra.*

We conclude, however, that the error was harmless beyond a reasonable doubt because the admissions obtained were merely cumulative of evidence the Commonwealth had obtained at the time the statements were made. When the questioning continued, the defendant admitted that he had been at the house earlier than 6 A.M. and that he had gone inside the apartment, but he maintained that he saw nothing, touched nothing, heard nothing, and left without seeing anyone.[12]

Just before invoking his right to counsel, the defendant had made a statement that could be construed as an admission that he was in Rice's apartment the morning she was killed. Moreover, two witnesses had already placed the defendant at and inside the apartment at the time of the murder. Finneral, Rice's landlord and upstairs neighbor, was accustomed to the defendant's late night comings and goings, and the sound of his combat boots. She recognized the sound of his boots inside Rice's apartment during the early morning hours at the time of the murder. The sound woke her up. At about 6 A.M., she heard the back door slam. She looked out the window and saw the defendant put something in the trunk of his car, look up at the house, and drive away. Finneral recognized the defendant, having met him on at least one occasion. In addition, Rice's next-door neighbor had seen the defendant's car when she got home

---

[12]In his revised version of events, the defendant said that he arrived in Lowell around 4 A.M. and he went inside. It was dark and silent inside. He peered through the doors of the bedrooms and the bathroom but could not tell if anyone was there. He stayed in the kitchen in the dark for about thirty minutes and then he left.

shortly after midnight the night of the murder. She thought at first that it belonged to someone who had come to her house because it was parked in the street near her property line. She told police that by the time she got up the next morning, the car was gone. At the police station, both neighbors positively identified the defendant's car as the car they had seen at the house. In addition, evidence that the bodies of his sons were found in a gear locker at the base warranted an inference that he had been in Rice's apartment.

The abrupt shift in the defendant's story following his request for counsel did not result in any prejudice because it only mirrored similar shifts in his story prior to requesting counsel. Any unfavorable inference the jury might have drawn from hearing a contradictory account of his actions the night of the murder had solid foundation from the accounts he gave before invoking his right to counsel.

5. *Suppression of physical evidence.* The defendant claims that the purported health and safety inspection of the locker for ammunition was a ruse to search for the children or for evidence of their disappearance. He further argues that the motion judge clearly erred when she found that the search was a proper military health and safety inspection by military personnel because the search was tainted by State police involvement.

"In reviewing a ruling on a motion to suppress evidence, we accept the judge's subsidiary findings of fact absent clear error and leave to the judge the responsibility of determining the weight and credibility to be given oral testimony presented at the motion hearing." *Commonwealth* v. *Eckert*, 431 Mass. 591, 592-593 (2000). We give substantial deference to the judge's ultimate findings and conclusions of law, "but independently review[] the correctness of the judge's application of constitutional principles to the facts found." *Commonwealth* v. *Magee*, 423 Mass. 381, 384 (1996), quoting *Commonwealth* v. *Mello*, 420 Mass. 375, 381 n.8 (1995). We summarize the facts as found by the motion judge, supplemented by testimony at the suppression hearing credited by the judge.

ANG Master Sergeant Wayne Raymondo oversaw the military personnel involved in the search on the base, while State Trooper James Plath oversaw the State police. At approximately

2 A.M., based on information that the defendant had been at the base the morning after the murders, and pursuant to Mil. R. Evid. 315(b)(1),[13] Raymondo obtained oral authorization from ANG Lieutenant Colonel Paul Worcester to search the defendant's rooms for the children.[14] The children were not found, but police observed a dirty diaper, empty yogurt containers, and the defendant's wet and sandy army fatigues. These items, plus a digging tool that had been observed in plain view in the defendant's car, led authorities to hope that the children might still be alive but hidden somewhere on the base. At approximately 4 A.M., in response to a request from the State police that the search for the children be expanded to the entire area of Camp Edwards,[15] Sergeant Raymondo sought and obtained the requisite oral authorization from the base installation commander, Colonel Shriver. See Mil. R. Evid. 315(b)(1).

Around 4 A.M., while the military personnel and State police were being mobilized for the expanded search, ANG Sergeant John Stowe and his superior, ANG Sergeant Richard MacDonald, discussed their hope that the allegations against the defendant would turn out to be a mistake. Both men had worked

[13]Rule 315 of the Military Rules of Evidence governs probable cause searches. Rule 315(b)(1) provides: "An 'authorization to search' is an express permission, written or oral, issued by competent *military* authority to search a person or an area for specified property or evidence or for a specific person and to seize such property, evidence, or person." Contrast Mil. R. Evid. 315(b)(2) ("A 'search warrant' is an express permission to search and seize issued by competent *civilian* authority" [emphasis added]).

[14]Each of the defendant's rooms was a double room, although no other personnel were assigned to either room at the time of the searches. Although the defendant does not raise the issue on appeal, we conclude that the search for the children in the defendant's rooms was proper. ANG Sergeant Raymondo obtained authorization from competent military authority and that authorization was properly limited in scope. See Mil. R. Evid. 315. In addition, the search of the rooms was further justified by the exigent circumstances of the missing children. See Mil. R. Evid. 314(i) ("Emergency searches to save life or for related purposes").

[15]Otis Air Force Base makes up a small part of Camp Edwards. The base is distinguished from the rest of Camp Edwards by checkpoints that secure its entrance and exit and by the military personnel guarding the planes. The State police have jurisdiction over and are assigned to patrol the "unsecured" areas of Camp Edwards. The State police testified, however, that for their own safety, the only area on the base that they are generally barred from patrolling is the active flight line.

with the defendant. MacDonald considered the defendant a good friend. Stowe mentioned that the last time he worked with the defendant, the defendant told him that he was storing ammunition in his gear locker in building 868 located on Outer Road. For safety and environmental reasons, ammunition left over from training exercises or missions is returned to the armory. Improperly stored ammunition is contraband. See *United States* v. *Valdez*, 35 M.J. 555, 557 n.2 (A.C.M.R. 1992), aff'd, 40 M.J. 491 (C.M.A. 1994) (officer charged with larceny of military property for storing blank ammunition in storage locker).

MacDonald reported Stowe's information to Raymondo, his superior. On the basis of that information, Raymondo decided to search the locker as Stowe's information raised safety concerns. He informed Trooper Plath of his plan to search the locker for improperly stored ammunition and asked if Plath would send a trooper along. Plath ordered Trooper Toby to accompany them but to remain in radio contact.

The trooper followed Raymondo and MacDonald in his cruiser to building 868. Once there, MacDonald directed them to the defendant's locker, which was located next to his own locker. MacDonald cut off the lock with bolt cutters. He immediately saw loose rounds of ammunition on the top shelf of the locker. He also observed a crate at the bottom of the locker that held metal canisters used for storing ammunition. In order to determine whether the ammunition observed in the crate was live or blank, MacDonald removed a clear plastic bag containing a knapsack that was stored on the top of the crate. As he removed the bag, he commented that it was unusually heavy for its size. He placed the bag on the floor and knelt on it in order to examine the ammunition stored in the crate.

As he was returning the bag to the locker, he commented again on its weight. Patting the outside of the bag, he described aloud what he thought might be a helmet and the butt of a gun. He asked if he should open it. Trooper Toby, a silent observer until that moment, asked whether the military were "issued . . . weapons or ammunition that would fit in such size of a bag." MacDonald replied that it could be anything. He proceeded to open the outer plastic bag. He unzipped the

knapsack and he and Raymondo pulled open the inner plastic bag. MacDonald jumped back in horror when he observed the hand of a small child. Trooper Toby knelt down and peered in the bag. He saw two small bodies. He used the tip of a pen to conduct a capillary refill test. Both children were dead. He immediately called his superior and secured the building. Shortly thereafter, the police arrived with a search warrant and the knapsack was seized.

The judge credited the testimony of the military personnel that they had initiated and conducted the search, and that their sole purpose for doing so was due to concern that the safety of government property and personnel might have been compromised by the improper storage of ammunition. The judge found that the defendant failed to prove that the search for weapons was a ruse to cover the State police's desire to search the locker for evidence. The judge further found that Trooper Toby's participation was minimal and that his presence did not taint the search or make the military personnel agents of the State. These findings evince no clear error as they were well supported by the evidence presented at the suppression hearing.

The judge concluded that the search was a proper inspection search by military authorities pursuant to Mil. R. Evid. 313(b). An inspection is proper under this rule when its purpose is "to ensure the security, military fitness, or good order and discipline of the unit, organization, installation, vessel, aircraft, or vehicle." *Id.* Where the search is conducted in response to particularized information regarding the presence of unlawful weapons or other contraband, and where the search is conducted outside the routine of a general health and safety inspection, the burden is on the prosecution to demonstrate by clear and convincing evidence that the search was not conducted primarily as a law enforcement mechanism. See *United States* v. *Jackson*, 48 M.J. 292, 294, 296 (C.A.A.F. 1998), cert. denied, 525 U.S. 1107 (1999) (as long as primary purpose of examination is proper, inspection will be upheld where it "take[s] place after the commander receives specific information about the presence of contraband . . . [even where discovery of weapons or contraband] result[s] in disciplinary proceedings"). Cf. *Commonwealth* v. *Aarhus*, 387 Mass. 735, 741 (1982) (military of-

ficials had "legitimate, independent interest in conducting the search" where defendant, an enlisted member of the army, was implicated in murder of servicewoman). The motion judge's findings that the primary purpose of the locker search was safety is well supported, hence we are bound by the judge's legal conclusion that the prosecution met its burden of proving that the search was a lawful inspection.

We note, however, that, although the issue of staleness was not argued on appeal, we are troubled by the fact that Stowe's information about the improper storage of ammunition dated back to July, some two months before the search. We find little guidance in opinions construing Mil. R. Evid. 313(b), with regard to the issue of staleness. Still, we are confident that, even if the search was not a proper inspection under Mil. R. Evid. 313(b), the search was proper under Mil. R. Evid. 314(d), because the defendant did not have a reasonable expectation of privacy in his gear locker in building 868.[16] See *United States* v. *Muniz*, 23 M.J. 201, 205 (C.M.A. 1987).

All members of the ANG had access to building 868 as it was used to store and clean equipment issued for use during training exercises. See *United States* v. *Battles*, 25 M.J. 58, 60 (C.M.A. 1987). All members were entitled to have a storage locker in building 868 if they so requested but lockers were not individually assigned. The building was located some distance from the members' barracks. Cf. *United States* v. *Neal*, 41 M.J. 855, 860 (A.F.C.M.R. 1994). The locker and the lock securing the locker were government issued for the purpose of storing and securing gear such as helmets and gear used in ANG training missions. Neither ammunition nor weapons were to be stored in the lockers. Where, as here, the building was used strictly for the members' performance of their official duties and

---

[16]Rule 314(d) of the Military Rules of Evidence provides: "Government property may be searched under this rule unless the person to whom the property is issued or assigned has a reasonable expectation of privacy therein at the time of the search. Under normal circumstances, a person does not have a reasonable expectation of privacy in government property that is not issued for personal use. Wall or floor lockers in living quarters issued for the purpose of storing personal possessions normally are issued for personal use; but the determination as to whether a person has a reasonable expectation of privacy in government property issued for personal use depends on the facts and circumstances at the time of the search."

the property secured in the lockers was government property, we conclude that the defendant did not have a reasonable expectation of privacy and hence, the search was proper under Mil. R. Evid. 314(d). See *United States* v. *Muniz, supra* at 204; *United States* v. *Tanksley*, 50 M.J. 609, 620 (N-M.C.M.R. 1999) (military personnel do not "acquire a reasonable expectation of privacy in Government property designated or assigned [for performance of official duties] even if capable of being secured"), aff'd, 54 M.J. 169, 172 (C.M.A. 2000). Cf. *Commonwealth* v. *Welch*, 420 Mass. 646, 654 (1995) (fire fighter did not have reasonable expectation of privacy in common areas of barracks). The motion to suppress physical evidence was properly denied.

6. *Relief under G. L. c. 278, § 33E.* We have reviewed the entire record, the transcripts, the briefs, and the arguments. We decline to reduce the convictions or order a new trial.

*Judgments affirmed.*