## COMMONWEALTH *vs.* PAUL H. LeCLAIR.

No. 00-P-861.

Worcester. June 12, 2001. - June 18, 2002.

Present: PORADA, COWIN, & McHUGH, JJ.

*Homicide. Constitutional Law,* Admissions and confessions, Assistance of counsel, Waiver of constitutional rights. *Practice, Criminal,* Voluntariness of statement, Admissions and confessions, Assistance of counsel, Waiver, Interlocutory appeal.

A Superior Court judge erred in granting the motion of a defendant charged with murder in the first degree to suppress a statement he had given to police investigators after he had invoked his right to counsel, where the defendant's remarks following the invocation evinced a desire for more generalized conversation at least sufficient to permit further inquiry by the police whether the defendant continued to stand by his earlier invocation of his right to counsel, and where substantive questioning began only after the defendant freely and voluntarily waived his right to counsel. [242-246]

INDICTMENTS found and returned in the Superior Court Department on March 4, 1998.

A pretrial motion to suppress evidence was heard by *Patrick F. Brady*, J.

An application for leave to prosecute an interlocutory appeal was allowed by *Neil L. Lynch*, J., in the Supreme Judicial Court for the county of Suffolk, and the case was reported by him to the Appeals Court.

*Anne S. Kennedy*, Assistant District Attorney, for the Commonwealth.

*James J. Gribouski* for the defendant.

McHUGH, J. Following the death of the defendant's wife, the defendant was indicted for murder in the first degree. Thereafter, he sought suppression both of a statement he had given to State police investigators and of a letter he had written to his wife. A

judge of the Superior Court allowed the motion to suppress the statement but denied the motion to suppress the letter. A single justice of the Supreme Judicial Court allowed the Commonwealth's motion for an interlocutory appeal, and the defendant cross-appealed. We reverse that portion of the judge's order suppressing the statement.

The facts found by the motion judge, supplemented by the uncontested evidence, see *Commonwealth* v. *Ciaramitaro*, 51 Mass. App. Ct. 638, 639 (2001), show that a noontime telephone call from the defendant's wife alerted Charlton police to the defendant's presence at the couple's home; she reported that he, armed with a knife, was threatening to kill her. Officers Mason and Pervier raced to the scene and entered the house. There, they saw the defendant, with a gun to his head, kneeling on the floor over his wife's prostrate, bleeding body. She was barely alive.

The officers persuaded the defendant to drop his gun. When he did, they handcuffed him and placed him in their cruiser. An ambulance soon arrived and removed the victim. Nevertheless, she rapidly succumbed to her injuries.

Charlton police Sergeant Danforth got to the scene shortly after the ambulance. Following his arrival, Sergeant Danforth approached the defendant where he was sitting in the back seat of the cruiser and asked whether anyone had given him a Miranda warning. When the defendant replied in the negative, Sergeant Danforth read him the advice *Miranda* v. *Arizona*, 384 U.S. 436 (1966), requires. After the defendant told Sergeant Danforth he understood the warning, Sergeant Danforth asked if he would like to talk about what had happened. Responding affirmatively, the defendant described a brief argument that he said had escalated to the point where he stabbed his wife in her shoulder.[1]

The defendant ended his account by asking about his wife's condition. Sergeant Danforth replied that medical personnel were still working on her. At that point, the defendant told Sergeant Danforth that he did not think he should say anything else without talking to an attorney. Understanding that state-

---

[1]The defendant does not seek suppression of that statement.

ment as the defendant's invocation of his right to counsel, Sergeant Danforth immediately stopped his inquiries.

About twenty minutes later, Sergeant Danforth took the defendant to the Charlton police station where he again read him the Miranda warnings and tendered to him a Miranda waiver sheet. Again, the defendant said he understood what Sergeant Danforth had read but did not want to talk about the events surrounding the stabbing. He also declined to sign the waiver sheet.

The defendant then asked Sergeant Danforth about how he went "about getting a lawyer." Sergeant Danforth responded by asking the defendant if he were requesting a lawyer. The defendant said that he was but asked if he could change his mind later. Sergeant Danforth told him that "he could change his mind, it was totally up to him," but that, if he requested an attorney, "[w]e're all done talking." At that, the defendant said "[b]ut you'll tell me . . . what the hell is going on?" Sergeant Danforth said that he would. Sergeant Danforth understood this exchange as the defendant's renewed invocation of his right to counsel and asked him no questions about the incident thereafter.

Sergeant Danforth continued the booking process, during the course of which the defendant telephoned his sister and told her that he had stabbed his wife and that he needed an attorney.[2] When the booking ended, the defendant was taken to a cell in the police station.

After spending some time in the cell, the defendant was brought back to the booking room.[3] He sat there under the eye of Charlton police Sergeant Stevens, who had received instructions from the Charlton police chief to sit with the defendant but to have "minimum contact" with him. Sergeant Stevens followed those instructions and initiated no conversations with the defendant. From time to time, however, the defendant inquired about his wife's condition. Each time, Sergeant Stevens replied

---

[2]The defendant does not contend that that statement, which police overheard, should be suppressed. The record does not reflect that the sister undertook the task of obtaining counsel for the defendant.

[3]The police were apparently concerned that the defendant, who had running water in his cell, might wash off any blood spattering on his clothing.

that he did not know.[4] Twice, the defendant asked if he needed an attorney and both times Sergeant Stevens said the defendant would have to decide that for himself. At various points, the defendant said he was concerned about what the neighbors were going to think, about his children, and about what was going to happen. Sergeant Stevens offered nothing of substance in reply. Toward the end of their time together, the defendant asked Sergeant Stevens if he was in a lot of trouble, and Sergeant Stevens told him that he was.

After sitting in the booking area with Sergeant Stevens for about an hour, the defendant was returned to his cell, where he remained for about one and one-half hours. During that time, Sergeant Stevens spoke with Sergeant Greene of the Massachusetts State Police, the senior State police officer involved in the investigation. Sergeant Greene asked Sergeant Stevens if the defendant had requested an attorney. Although Sergeant Stevens said that he did not know, Sergeant Danforth told Sergeant Greene a short time later that the defendant had made such a request.[5]

At about 5:00 P.M., a Charlton police officer brought the defendant to an interview room where State police Troopers Ferraro and Hart were waiting.[6] When he arrived in the room, the defendant shook hands with the troopers, who then read him the Miranda warnings. The defendant said he understood the warning's content, signed a "waiver" card and told the troopers he wanted to talk with them. The defendant then gave the troopers an extensive statement that the judge, in a finding the defendant does not challenge, found was the product of a free

---

[4]The evidence does not suggest that he did.

[5]Sergeant Danforth testified that he told Sergeant Greene about the defendant's invocation of his right to counsel. Sergeant Greene said that Sergeant Danforth had given him no such information and that, on the contrary, he understood that the defendant was "talking to" police. The motion judge credited Sergeant Danforth's testimony regarding what he had told Sergeant Greene but made no finding on whether Sergeant Greene believed that the defendant was "talking to" police officers.

[6]The officer brought the defendant to the interview room on Sergeant Greene's instructions, because Sergeant Greene wanted the troopers to interview the defendant. See n.5, *supra.*

and voluntary waiver of his right to counsel. That is the statement the defendant moved to suppress.[7]

The motion judge, relying on *Edwards* v. *Arizona*, 451 U.S. 477 (1981), found that the challenged statement should be suppressed because police improperly interrogated the defendant after he had clearly invoked his right to counsel.[8] Although the judge's focus on *Edwards* was surely correct, we disagree with the conclusion he reached.

The Federal "bright line" rule *Edwards* embodies, see *Commonwealth* v. *Perez*, 411 Mass. 249, 258 (1991), provides that, once a suspect invokes his or her right to counsel, police may not conduct further custodial interrogation[9] unless counsel are present or unless the defendant freely waives the rights *Miranda* describes. See also *Arizona* v. *Roberson*, 486 U.S. 675, 683-684 (1988); *McNeil* v. *Wisconsin*, 501 U.S. 171, 177 (1991). As one might expect, the Commonwealth has the burden of proving beyond a reasonable doubt that statements made without the presence of an attorney after invocation of the right to counsel were preceded by a valid waiver of the defendant's Miranda rights. *Commonwealth* v. *Contos*, 435 Mass. 19, 30 (2001). After the right to counsel has been invoked, though, "[a] valid

[7]In his statement, the defendant mentioned a letter he had written to his wife. On the basis of the statement, police officers obtained a warrant authorizing them to search for the letter as well as for other items about which they had learned from independent sources. The defendant moved to suppress the letter as the fruit of what he claimed was the poisoned statement he had given police. See *Commonwealth* v. *Loughlin*, 385 Mass. 60, 63 (1982). The trial judge denied that motion, ruling that the police would have inevitably discovered the letter during their search for other items. See *Commonwealth* v. *O'Connor*, 406 Mass. 112, 115-119 (1989). Our conclusion that the defendant's statement should not have been suppressed obviates the need to determine whether that ruling was correct.

[8]The Commonwealth has informed us not only that it disagrees with the trial judge's "ultimate determinations" but also that it "takes umbrage with" them. The appellate process, of course, benefits from the sound legal analysis the parties tender to the court and to each other. Bulletins about a ruling's impact on a party's mental tranquility, however, play no useful role in that process.

[9]*Edwards* enforces *Miranda* and thus is limited to custodial interrogations. See generally *McNeil* v. *Wisconsin*, 501 U.S. 171, 176-177 (1991). It also effectuates Fifth Amendment principles, not those prescribed by the Sixth. *Ibid.* *Commonwealth* v. *Rainwater*, 425 Mass. 540, 554-555 (1997), cert. denied, 522 U.S. 1095 (1998).

waiver . . . cannot be established by showing only that [a defendant] responded to further police-initiated custodial interrogation even if he [or she] has been advised of his [or her] rights." *Ibid.*, quoting from *Edwards* v. *Arizona*, 451 U.S. at 484. Put another way, "[i]f the police do subsequently initiate an encounter in the absence of counsel . . . , the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." *McNeil* v. *Wisconsin*, 501 U.S. at 177.

Different considerations apply if the defendant initiates further discussion with police after invoking the right to counsel. "Where the suspect does so, reinterrogation may follow, but 'the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation.' *Oregon* v. *Bradshaw*, 462 U.S. 1039, 1044 (1983). Thus, before police may recommence interrogation in these circumstances, they must first obtain from the suspect a voluntary, knowing, and intelligent waiver." *Commonwealth* v. *Sarourt Nom*, 426 Mass. 152, 157 (1997).

Sometimes, the defendant's initiation of further discussion takes the form of the defendant's expressed desire to tell his or her side of the story or otherwise provide the police with information relative to the offense.[10] As *Oregon* v. *Bradshaw*, 462 U.S. 1039 (1983), demonstrates, however, initiation can

---

[10]See, e.g. *Commonwealth* v. *Phinney*, 416 Mass. 364, 368-369 (1993) (after questioning ceased because of the defendant's invocation of his right to counsel, the defendant asked what was going to happen to him and, upon receiving an explanation of the different degrees of murder and manslaughter, stated he wanted to tell the truth); *Commonwealth* v. *Sarourt Nom*, 426 Mass. at 157 (a short time after invoking his right to counsel, the defendant, without being prompted by any police comment, said "I admit it" and thereafter made incriminating statements); *Commonwealth* v. *Rankins*, 429 Mass. 470, 472-473 (1999) (following invocation of his right to counsel, the defendant asked for some time to think things over and, after doing so, told police officers that he wanted to talk); *Commonwealth* v. *D'Entremont*, 36 Mass. App. Ct. 474, 475-476 (1994) (after invoking his right to counsel, police told the defendant that they had spoken to the victim and would be willing to speak to him if he changed his mind, whereupon the defendant proceeded to "tell . . . his side of the story").

also be far more subtle, beginning simply with a defendant's questions regarding his status or the investigation's progress. In *Bradshaw,* the defendant invoked his right to counsel but shortly thereafter asked an officer what was going to happen to him. The officer responded by saying that the defendant had requested counsel and therefore should not say anything "unless you so desire because anything you say — because — since you have requested an attorney, you know, it has to be at your own free will." *Id.* at 1042. The defendant said that he understood, and the officer followed by telling him that he "might help himself by taking a polygraph examination." *Ibid.* The next morning, after again receiving Miranda warnings, the defendant took the examination and subsequently made incriminating statements. The Court's plurality opinion held that *Edwards* did not prohibit admission of the incriminating statements because the defendant's inquiry about what was to happen to him signaled a resumption of communications with police and the statements he made later were entirely voluntary. *Id.* at 1045.[11]

Here, the Commonwealth's arguments to the contrary notwithstanding, the defendant's expressed desire for counsel at the scene and during the booking process was, as Sergeant Danforth astutely recognized, sufficiently clear and unequivocal to require termination of police interrogation. See *Commonwealth v. Contos,* 435 Mass. at 29-30.[12] For the thoughtful motion judge, the terminating force of the defendant's request was "the

---

[11]There was no majority opinion in *Bradshaw.* Justice Rehnquist's plurality opinion required a two-step analysis: (1) whether, after invoking a right to counsel, defendant reinitiated contact with police through inquiries or statements evincing a desire for a "more generalized discussion relating directly or indirectly to the investigation," and, if so, (2) whether any subsequent incriminating statements were the product of a free and voluntary waiver of the defendant's right to counsel. 462 U.S. at 1044-1045. The four dissenters agreed with the need for a two-step inquiry and on the contents of the second step. For them, however, the first inquiry should center on whether the defendant initiated a dialogue specifically and directly focused on the investigation or some component of it. *Id.* at 1053 (Marshall, J., dissenting). Concurring in the judgment, Justice Powell was of the view that *Edwards* required no bifurcated analysis at all. Instead, the question in every case was simply whether there was a free, uncoerced and voluntary waiver of the right to counsel. *Id.* at 1048-1051 (Powell, J., concurring).

[12]His subsequent queries to Sergeant Stevens regarding his need for counsel cannot be used to muddy the clarity of his initial request. Invocation and

end of the story." But few stories in law, logic or life end in the middle. Viewed objectively, see *Davis* v. *United States*, 512 U.S. 452, 459 (1994); *Commonwealth* v. *D'Entremont*, 36 Mass. App. Ct. 474, 479 (1994), the defendant's subsequent statement to Sergeant Stevens that he thought he was in a lot of trouble, and his twice repeated inquiry whether he needed counsel, evinced a desire for more generalized conversation at least sufficient to permit further inquiry about whether the defendant continued to stand by his earlier invocation of his right to counsel.[13] Police conducted that further inquiry by reading the defendant the entire Miranda warning anew. Substantive questioning began only after the defendant freely and voluntarily waived his right to counsel and agreed to discuss the circumstances attending his infliction of mortal wounds upon his wife.

There was in this case no police badgering of the type found in *Edwards*. Unlike *Contos*, there was no search through the unambiguous for gradations of meaning. There was here no use of provocative statements to circumvent a request for counsel. Compare *Commonwealth* v. *Chadwick*, 40 Mass. App. Ct. 425, 428-429 (1996). Instead, the defendant's invocation of counsel immediately halted all interrogation. No further questioning occurred until the defendant both initiated communication with police regarding the events of the day and, thereafter, freely and voluntarily waived his right to counsel. In this area, the law of the Commonwealth is glued to Federal law, see *Commonwealth* v. *Brennan*, 386 Mass. 772, 775 (1982); *Commonwealth* v. *Rainwater*, 425 Mass. 540, 554-555 (1997), cert. denied, 522 U.S. 1095 (1998), and the defendant makes no argument suggesting otherwise. When the circumstances set out above are

subsequent waiver of the right to counsel are two distinct concepts. *Smith* v. *Illinois*, 469 U.S. 91, 97-98 (1984).

[13]The motion judge thought that the statements were not sufficient indications of a change of heart to permit further questioning. We accept the judge's factual findings but "[o]ur appellate function requires that we make our own independent determination on the correctness of the judge's 'application of constitutional principles to the facts as found . . . .' " *Commonwealth* v. *Haas*, 373 Mass. 545, 550 (1977), quoting from *Brewer* v. *Williams*, 430 U.S. 387, 403 (1977). The question is not whether the defendant's statements evinced a waiver of his right to counsel, but simply whether they permitted a police inquiry to determine whether he intended to do so.

viewed, as they must be, in light of the controlling Federal law, police properly obtained the resulting statement, and the order suppressing it must be reversed. So much of the order as allowed in part the defendant's motion to suppress is reversed; in all other respects the order is affirmed.

*So ordered.*