## Commonwealth *vs.* Paul H. LeClair.

Worcester. November 8, 2005. - January 11, 2006.

Present: Marshall, C.J., Greaney, Ireland, Spina, & Cordy, JJ.

*Homicide. Practice, Criminal,* Admissions and confessions, Assistance of counsel, Motion to suppress, Unsworn statement by defendant, Request for jury instructions. *Constitutional Law,* Admissions and confessions, Assistance of counsel. *Evidence, Admissions and confessions.*

A Superior Court judge erred in granting the criminal defendant's motion to suppress certain statements that he had made to police on the ground that the defendant had been interrogated after having clearly invoked his right to counsel, where the defendant, after having done so, initiated further conversation with the police, and therefore, the interrogation was proper. [737-739]

At the trial of an indictment charging the defendant with murder in the first degree in connection with the stabbing death of his wife, the judge correctly denied the defendant's request for an instruction on voluntary manslaughter, where evidence of provocation by a third party (the wife's brother) was, as a matter of law, insufficient to warrant such an instruction, and where no view of the evidence would permit a determination that the wife played even an inconsequential role in provoking her own death. [739-744]

Indictment found and returned in the Superior Court Department on March 4, 1998.

A pretrial motion to suppress evidence was heard by *Patrick F. Brady*, J., and the case was tried before *James P. Donohue*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Chauncey B. Wood* for the defendant.

*David Waterfall*, Assistant District Attorney, for the Commonwealth.

The following submitted briefs for amici curiae:

*Debra S. Krupp*, Committee for Public Counsel Services, for Committee for Public Counsel Services.

*Timothy J. Cruz,* District Attorney, *& Robert C. Thompson,* Assistant District Attorney, for District Attorney for the Plymouth District.

*William M. Bennett,* District Attorney, *Jane Davidson Montori & Katherine E. McMahon,* Assistant District Attorneys, for District Attorney for the Hampden District & others.

GREANEY, J. The defendant was indicted for murder in the first degree in connection with the stabbing death of his wife. A jury in the Superior Court convicted him of murder in the second degree. On this appeal, he argues that a written incriminating statement he gave to State police investigators should have been suppressed, and that his request for a voluntary manslaughter instruction was improperly denied because he had acted in heat of passion caused by a third person, his wife's brother. We granted the defendant's application for direct appellate review and affirm his conviction.

The jury could have found the following facts. In December, 1997, the victim and the defendant were experiencing marital conflict. The couple had been married for twelve years and had one son. The victim also had a son from a previous relationship who had lived with the defendant since the age of six months and whom the defendant treated as a son. The victim decided to leave the defendant because he was too controlling. She left their Charlton home on December 25, and did not tell the defendant where she was staying. Although the defendant hired a private agency to investigate her whereabouts and to ascertain whether she was having an affair, the defendant was not able to locate her. A few days prior to the killing of the victim, the defendant told the victim's older son that his mother would be coming home and that he should "take a picture of her because you might not see her again."

The victim returned home on the morning of January 4, 1998. The victim's brother arrived shortly thereafter and found the victim and the defendant talking in the kitchen. On her brother's arrival, the victim went outside on the back deck to smoke a cigarette. The defendant was irritated to see his brother-in-law and said, "She's not dead yet." The victim's brother then joined his sister on the deck. After about five minutes, they both went back inside the house, and the victim told the defendant that she

was going to leave him. The defendant became upset. The defendant and the victim then asked her brother to go outside and wait while they finished their conversation. While outside, the victim's brother could not discern what was being said indoors, but could hear that the conversation in the kitchen was "getting loud." At some point, the victim grabbed her cigarettes, lighter, and keys, and rejoined her brother on the deck. The defendant, now visibly upset, followed. He pointed inches from his brother-in-law's face and said, "I don't want you on my fucking property." The victim's brother responded, "[A]fter everything that I heard that's going on, you don't want to mess with me." The defendant then swung at the victim's brother but missed. The two men wrestled, and the victim's brother eventually pinned the defendant to the ground. Her brother yelled to the victim to telephone the police. The two boys, now on the deck, screamed for the men to stop. The family dogs were barking and biting at the two men. The victim, who had gone into the house to telephone the police, ran back outside to urge her brother to let the defendant go.

The victim's brother, who had planned to hold the defendant until the police arrived, released him when the defendant said, "Just lay off, I'm not going to do anything. I'm not going to do anything." Once released, the defendant went quickly into the kitchen and picked up a knife. The victim, who was in the kitchen on the telephone with the police, screamed, "Oh my God, he's got a knife . . . . Oh my God, he's going to stab me." The defendant grabbed the victim and, while her brother and sons looked on, raised the knife and brought it straight down into her upper arm. He then held the knife to the victim's throat and dragged her down the hallway. As the two boys ran to a neighbor's house, the defendant went toward his brother-in-law with the knife and said, "I'll fucking kill her if you don't get out of the house." The victim's brother then ran outside to wait for the police. When the police arrived, they found the defendant kneeling on the floor beside the victim, a cocked revolver at his temple. One officer told him to put the weapon down, and the defendant complied. The defendant was handcuffed and placed in the back of a police cruiser. A sergeant of the Charlton police department advised him of his Miranda

rights. The defendant told the sergeant that he and the victim's brother had argued; that the victim stood between them during the argument; and that he (the defendant) had grabbed a knife and stabbed her. The victim was pronounced dead that afternoon at a hospital.[1]

The jury also could have found that, later at the Charlton police station, after again being advised of his Miranda rights, the defendant gave a written statement to State police investigators admitting that he had stabbed the victim. In his statement, the defendant recounted his fight with the victim's brother and stated that he had been "so mad something snapped." When asked whether he stabbed his wife to prevent her from talking to the police, the defendant responded, in his statement, that "the snap happened because I knew at that point that the relationship was over and she created that with her brother." The defendant further explained that he "grabbed the knife to defend myself against her brother, but when I heard her on the phone, I snapped and went after her. . . . [S]ince she wanted the relationship over then I was going to really end it by stabbing her."

The defendant did not testify at trial. In his defense, he presented evidence that he had struggled with depression in the months leading up to the killing and that he had set up an appointment with an attorney for a divorce consultation for the day after the killing. A neighbor testified that she and the defendant had planned to discuss school bus arrangements at a neighborhood dinner scheduled to take place on the afternoon of the killing. The defendant argued to the jury, essentially, that the Commonwealth's evidence did not support a finding of deliberate premeditation so that he could not be found guilty of murder in the first degree.

1. A judge in the Superior Court allowed the defendant's motion to suppress his written incriminating statement to State police investigators, because the judge, relying on *Edwards* v. *Arizona*, 451 U.S. 477 (1981), determined that the defendant had been interrogated after he had clearly invoked his right to

---

[1]Based on testimony of the medical examiner, the jury could have concluded that the victim bled to death from an eight-inch deep stab wound that severed her brachial artery.

counsel in conversations with the Charlton police and had not reinitiated further communications. The Commonwealth applied for leave to take an interlocutory appeal from the suppression order, and the defendant cross-appealed. See Mass. R. Crim. P. 15 (a) (2), as appearing in 422 Mass. 1501 (1996). A single justice of this court allowed the application, and the appeal proceeded to the Appeals Court. In a published opinion, that court reversed the order suppressing the defendant's written statement, *Commonwealth* v. *LeClair*, 55 Mass. App. Ct. 238 (2002), and this court denied the defendant's application for further appellate review. 437 Mass. 1111 (2002). Thereafter, the defendant was tried and convicted of murder in the second degree and now, on this appeal, brings into issue the correctness of the Appeals Court decision vacating the suppression order.

We need not restate the factual background of the motion to suppress, which is set forth in the opinion of the Appeals Court. *Commonwealth* v. *LeClair, supra* at 239-242. The Appeals Court held that the Superior Court judge had erred in suppressing the defendant's written statement after he had invoked his right to counsel. The Appeals Court noted that, although the defendant did, initially, invoke his right to counsel (which the Charlton police scrupulously observed), he subsequently twice inquired of one officer whether he needed counsel and once asked whether he was "most likely in big trouble." Based on this record, the Appeals Court concluded that there had been no violation of the rule in *Edwards* v. *Arizona, supra,* because the defendant's remarks to the police following his invocation of his right to counsel evinced a desire for more conversation about the killing. That expressed desire was sufficient to permit further questioning by the police on whether the defendant continued to insist on his earlier invocation of his right to counsel, particularly where substantive questioning commenced only after the defendant freely and voluntarily waived his right to counsel. See *Commonwealth* v. *LeClair, supra* at 242-246.

The issue of the correctness of the suppression order is properly before us on the merits. The fact that further appellate review of the Appeals Court's decision was denied does not constitute an affirmation of the decision or reasoning of the Appeals Court. See *Ford* v. *Flaherty*, 364 Mass. 382, 387-388 (1973).

We agree with the Appeals Court's decision that the legal conclusions of the Superior Court judge that led to the suppression order were erroneous. In the area of *Edwards* issues, we closely follow Federal law. See *Commonwealth* v. *Rainwater*, 425 Mass. 540, 554-555 (1997), cert. denied, 522 U.S. 1095 (1998). In the factual circumstances found by the Superior Court judge, the defendant's remarks and questions, and his equivocation about his need for counsel, brought the case within *Oregon* v. *Bradshaw*, 462 U.S. 1039 (1983), which held that a defendant, after invoking his right to counsel, may "initiate" further conversation with the police and that if the defendant has done so, the police may properly interrogate him without violating the *Edwards* rule. *Id.* at 1045-1046. See *Commonwealth* v. *Rankins*, 429 Mass. 470, 472-473 (1999); *Commonwealth* v. *D'Entremont*, 36 Mass. App. Ct. 474, 475-476 (1994). It is not material to our conclusion that the State police investigators who obtained the defendant's written statement were not actually aware of his original invocation of counsel with the Charlton police or the remarks and questions by the defendant that had preceded their arrival at the Charlton police station. This is so because acts of legal significance had occurred between the defendant and the Charlton police that allowed the police to reopen with the defendant discussions about the killing, and it was unnecessary that the State police investigators actually knew about the acts before proceeding further with the defendant. Finally, although not necessary to our decision on the issue, we note that any error in the admission of the evidence of the defendant's written statement is harmless beyond a reasonable doubt in view of (a) the defendant's prior uncontested admission to the Charlton police that he had stabbed his wife; (b) the observation of the killing by two eyewitnesses (the victim's brother and son) who testified at trial; (c) the tape recording of the victim's 911 telephone call to the police, which transcribed the killing; and (d) our conclusions next to be discussed and reached, that the defendant was not entitled to a voluntary manslaughter instruction based on third-party provocation. See *Commonwealth* v. *Ghee*, 414 Mass. 313, 318-319 (1993).

2. The defendant argues that he was entitled to a voluntary

manslaughter instruction because he had been provoked to a point where the jury reasonably could find manslaughter by reason of his fight with the victim's brother.[2] In support of that argument, the defendant points to language in the American Law Institute's Model Penal Code § 210.3 (1980) that would appear to support such a principle and a decision by the Supreme Court of Minnesota holding that the defense of "heat of passion" may be based on conduct of a third party and need not be caused by the victim. See *State* v. *Stewart*, 624 N.W.2d 585, 589 (Minn. 2001). We reject the defendant's arguments and reaffirm our well-established rule that evidence of provocation by a third party, rather than the victim of a homicide, is insufficient to warrant a voluntary manslaughter instruction.

Manslaughter is a common-law crime that has not been codified by statute in Massachusetts, so its elements are derived from the common law. *Commonwealth* v. *Gonzalez*, 443 Mass. 799, 808 (2005); *Commonwealth* v. *Levesque*, 436 Mass. 443, 447-448 (2002). Manslaughter is not automatically a lesser included offense of either murder in the first or second degree; a verdict of manslaughter depends on evidence, not always necessarily present in murder, of "reasonable provocation that is accepted as sufficient in law to mitigate, but not excuse, an unlawful killing." *Ariel A.* v. *Commonwealth*, 420 Mass. 281, 286 (1995). "Our law on the evidence permitting a voluntary manslaughter instruction is well settled." *Commonwealth* v. *Keohane*, 444 Mass. 563, 569 n.5 (2005). "A killing may be rendered a voluntary manslaughter if it is the result of 'a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat.' [*Commonwealth* v. *Berry*, 431 Mass. 326, 334 (2000)], quoting *Commonwealth* v. *Walden*, 380 Mass. 724, 727 (1980). An instruction on voluntary manslaughter is appropriate if, viewing the evidence in the light most favorable to the defendant, 'there is evidence of provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and if the

[2]Although the defendant suggests in his brief that he was provoked, at least in part, by the victim's conduct in the final moments before her killing, it is clear from the trial transcript that the defendant's claim of entitlement to a voluntary manslaughter instruction relied exclusively on evidence of his physical altercation with the victim's brother.

killing followed the provocation before sufficient time had elapsed for the accused's temper to cool.' *Commonwealth* v. *Andrade*, 422 Mass. 236, 237 (1996), quoting *Commonwealth* v. *Schnopps*, 383 Mass. 178, 180 (1981)[, *S.C.*, 390 Mass. 722 (1984)]. 'The evidence must be sufficient to create a reasonable doubt in the minds of a rational jury that a defendant's actions were both objectively and subjectively reasonable. That is, the jury must be able to infer that a reasonable person would have become sufficiently provoked and would not have "cooled off" by the time of the homicide, and that in fact a defendant was provoked and did not cool off.' *Commonwealth* v. *Groome*, 435 Mass. 201, 220 (2001), quoting *Commonwealth* v. *McLeod*, 394 Mass. 727, 738, cert. denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985)." *Commonwealth* v. *Keohane*, *supra* at 567.

Our case law has consistently held that provocation sufficient to support an instruction of voluntary manslaughter must come from the victim. See *Commonwealth* v. *Ruiz*, 442 Mass. 826, 838-839 (2004), citing *Commonwealth* v. *Gruning*, 46 Mass. App. Ct. 842, 849 (1999), and cases cited; *Commonwealth* v. *Young*, 326 Mass. 597, 601 (1950); *Commonwealth* v. *Webster*, 5 Cush. 295, 303, 305 (1850) (noting that murder can constitute manslaughter if "death, though wilfully intended, was inflicted immediately after provocation given by the deceased"). We see no reason to depart from this view in this case.

The Model Penal Code provides that a criminal homicide constitutes manslaughter when it is committed "under the influence of extreme mental or emotional disturbance for which there is reasonable explanation or excuse. The reasonableness of such explanation or excuse shall be determined from the viewpoint of a person in the actor's situation under the circumstances as he believes them to be." Model Penal Code, *supra* at § 210.3(b). According to the commentary, this provision does not require that the defendant's emotional distress arise from some "injury, affront, or other provocative act perpetrated upon him by the deceased. Under the Code, mitigation may be appropriate where the [defendant] believes that the deceased is responsible for some injustice to another or even where he strikes out in a blinding rage and kills an innocent

bystander." Model Penal Code and Commentaries § 210.3 comment 5, at 61 (1980). Evidence of extreme mental or emotional disturbance is left to the jury to determine whether, in the circumstances, there is a reasonable "explanation or excuse for the [defendant's] mental condition." *Id.* We have not adopted the Model Penal Code and now decline to join its drafters in accepting the principle that reasonable provocation should not have to come from the victim.

As noted, the highest court of at least one State has applied the reasoning of the Model Penal Code to a murder case involving assertions of provocation by a third party. In *State* v. *Stewart*, 624 N.W.2d 585 (Minn. 2001), the court was called to interpret statutory language defining the crime of manslaughter as "intentionally caus[ing] the death of another person in the heat of passion provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances." Minn. Stat. Ann. § 609.20 (West 2000). The defendant in that case was indicted and tried on counts of murder in the first and second degrees for the stabbing deaths of a woman, their two year old son, and her unborn child, in a fit of rage after the victim disclosed to the defendant that she was HIV positive. Although the trial judge had instructed the jury as to manslaughter in connection with the deaths of the woman and the unborn child, he refused to so instruct the jury in connection with the death of the two year old, on the ground that the boy was not involved in the provocation. The fundamental question presented to the Minnesota Supreme Court thus was whether the Legislature intended that the statutory designations of "another person" (in reference to the victim) and "another" (in reference to the provocateur) must be the same person. The court concluded that "[t]he plain wording of the statute suggests that the [L]egislature did not intend them to be the same person." *Id.* at 589. Turning to the legislative history of § 609.20, the court noted that the statute was adopted as part of Minnesota's revised criminal code soon after the American Law Institute adopted the Model Penal Code. *Id.* (noting comment on § 609.20 by advisory committee on criminal law revision stated approval of Model Penal Code). The court recognized, as we have recognized above, that

§ 210.3 of the Model Penal Code focuses almost exclusively on the extreme mental state of the defendant and not on the source of the provocation. *Id.* at 589-590. The defendant argues that we should join the debate concerning the nature of provocation adequate to justify a manslaughter instruction and adopt the modern view that a defendant should not be precluded, as a matter of law, from receiving a voluntary manslaughter instruction, simply because the source of the defendant's provocation is a third party rather than the victim. We have previously rejected similar requests. See *Commonwealth* v. *Rivera*, 441 Mass. 358, 371 (2004); *Commonwealth* v. *Schnopps*, 390 Mass. 722, 726-727 n.4 (1984). We reject this one as well.

Our position reaffirms our case law and follows the prevailing view of other States that have considered this subject. See *State* v. *Bautista*, 193 Neb. 476, 480 (1975); *State* v. *Locklair*, 341 S.C. 352, 362 (2000), cert. denied, 531 U.S. 1093 (2001); *State* v. *Tilson*, 503 S.W.2d 921, 924 (Tenn. 1974). It is also the view subscribed to by authoritative commentators on criminal law. See W.R. LaFave & A.W. Scott, Jr., Criminal Law § 76, at 582 (1972) (noting that courts have "quite consistently held" that the intentional killing of an innocent bystander, when reasonably provoked by a third person, does not constitute manslaughter); R.M. Perkins & R.N. Boyce, Criminal Law 102 (3d ed. 1982) ("If one who has received adequate provocation is so enraged that he intentionally vents his wrath upon an innocent bystander, causing his death, he will be guilty of murder"). According to one such commentator, "[t]he courts have quite consistently held that the killing of [one known to be an innocent bystander] does not qualify as manslaughter, apparently upon the assumption that a reasonable man would never be so greatly provoked as to strike out in blind anger at an innocent person."[3] 2 W.R. LaFave, Substantive Criminal Law § 15.2(g), at 511 (2d ed. 2003). To hold otherwise would open up the law of voluntary manslaughter to far-reaching claims of

---

[3]Commentators also observe that, in circumstances where one (A) who is reasonably and actually provoked by another person (B) into a passion to kill B, shoots at B but accidentally hits and kills an innocent bystander, A's crime is voluntary manslaughter. See, e.g., W.R. LaFave & A.W. Scott, Jr., Criminal Law § 76, at 582 (1972). While we agree with this general proposition, it has no applicability in the present case.

heat of passion and provocation that are well beyond its common-law antecedents.

Here, the victim went inside to call for help on the telephone when her husband confronted her brother outside. After her brother had restrained the defendant, she asked her brother to let him go. She then returned to the kitchen to telephone the police. The defendant ran directly into the kitchen, picked up a knife, grabbed the victim from behind and stabbed her. Clearly, the moments leading up the killing were emotionally charged. Just as clearly, however, there is no view of the evidence that would permit a determination that the victim played even an inconsequential role in provoking her own death. The judge correctly refused to instruct the jury on voluntary manslaughter.

3. So much of the order of the Superior Court as allowed in part the defendant's motion to suppress is vacated. An order is to enter denying the motion to suppress in its entirety. The judgment is affirmed.

*So ordered.*