IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 27, 2017

**STATE OF TENNESSEE v. CHRISTOPHER JERALD CROWLEY**

**Appeal from the Criminal Court for Davidson County**
**No. 2013-A-678    Mark J. Fishburn, Judge**

_____

**No. M2016-02263-CCA-R3-CD**
_____

The Defendant, Christopher Jerald Crowley, was convicted by a jury of premeditated first degree murder and sentenced to imprisonment for life. See Tenn. Code Ann. § 39-13-202. On appeal, the Defendant contends (1) that the trial court erred in excluding the testimony of expert witnesses about the Defendant's mental health that the Defendant sought to present to establish that the killing was a voluntary manslaughter; (2) that the trial court erred in failing to instruct the jury on voluntary manslaughter; (3) that the trial court erred in admitting testimony from a witness about a statement the Defendant made several months before the killing; and (4) that the evidence was insufficient to sustain the Defendant's conviction. Discerning no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT L. HOLLOWAY, JR., JJ., joined.

Jason M. Chaffin, Nashville, Tennessee (at trial); and David M. Hopkins, Murfreesboro, Tennessee (on appeal), for the appellant, Christopher Jerald Crowley.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Brian Ewald and Leandra Justus Varney, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

During the early morning hours of October 18, 2012, the victim, Robert Mitchell, was sleeping on a bench across the street from the Criminal Justice Center in downtown

Nashville. The victim's aunt, Linda Cloyd, testified at trial that the victim typically lived with family members, but that in October 2012 the victim was homeless and working at the Nashville Rescue Mission.

Mario Hambrick was the co-owner of a bail bonding company and was working at his office near the Criminal Justice Center on October 18, 2012. Mr. Hambrick testified that he was going to his car at approximately 3:00 a.m. when he heard a single gunshot. After hearing the gunshot, Mr. Hambrick saw "a black Nissan Maxima with tinted windows . . . [rush] down the street and bust[] through [a] stop sign." Mr. Hambrick called the Criminal Justice Center property guard, James Cathey, to tell him about the gunshot. Mr. Hambrick also flagged down two Metropolitan Nashville Police Department (MNPD) officers he saw leaving the Criminal Justice Center.

MNPD Officer Charles Shaw was one of the officers flagged down by Mr. Hambrick. Officer Shaw recalled that the bench was about "a half a block" away from him when Mr. Hambrick flagged him down. When he got to the bench, Officer Shaw saw the victim "slumped over" on the bench. The victim had a gunshot wound to his head. The victim "was not responsive." Officer Shaw "called for medical aid" and began "secur[ing] the scene."

The victim was declared dead at the scene. The victim's backpack containing his belongs was found next to him. The investigating officers also found the victim's wallet and identification. A .380 caliber shell casing was found by a lamppost near the bench. The Criminal Justice Center had several closed-circuit television cameras. The investigating officers reviewed the surveillance footage with the Criminal Justice Center property guard and the footage was played for the jury at trial.

The surveillance footage showed a black sedan drive by the bench where the victim was sleeping at 2:31 a.m. The black sedan returned at 2:33 a.m. and parked near the bench with its headlights turned off before it drove away again. This pattern was repeated several times over the next thirty minutes. The Criminal Justice Center property guard became suspicious of the black sedan and zoomed in on its license plate.

At 3:03 a.m., the black sedan returned, "pulled into oncoming traffic," and parked facing the wrong direction at the curb by the bench. The surveillance footage showed that the sedan's driver's side door was open and that a person got out of the sedan. The person walked toward the bench and out of view of the surveillance camera. The sedan was left running with the driver's side door "wide open." The person was then seen returning to the sedan at "a much faster pace," and once the person was inside the sedan, it "immediately sped away."

The investigating officers ran the license plate number of the black sedan seen on the surveillance footage. The sedan was registered to the Defendant. Officers were dispatched to the apartment complex where the Defendant lived. The access gate to the apartment complex showed that the Defendant had entered the apartment complex at 3:15 a.m. on October 18, 2012. However, the officers were unable to locate the Defendant's car. As the officers were searching for the Defendant, his car pulled into the apartment complex. The Defendant was taken into custody at approximately 5:00 a.m. The arresting officers described the Defendant as being "very calm," "very compliant," and quiet. The Defendant did not ask the officers why he was being arrested and handcuffed.

The Defendant consented to a search of his car. No gun was found in the Defendant's car or on his person. The clothing the Defendant was wearing was seized for forensic testing and a gunshot residue test was administered on the Defendant's hands. Subsequent forensic testing by the Tennessee Bureau of Investigation revealed that gunshot residue was present on the sweatshirt the Defendant was wearing when he was arrested. The swabs of the Defendant's hands were inconclusive for gunshot residue.

An autopsy was performed on the victim and the victim's cause of death was determined to be "a gunshot wound to the back of his head." The bullet entered the left side of the victim's head and came to rest near the front of the right side of the victim's brain. The bullet was recovered from the victim's brain and placed into evidence. The medical examiner testified at trial that the victim would have immediately become unconscious upon being shot and died "fairly quickly thereafter."

Two of the Defendant's friends testified at trial about interactions they had with the Defendant in the months before the killing. Daniel Watkins testified that he was at a New Year's Eve party with the Defendant on January 1, 2012. Mr. Watkins recalled the Defendant "was kind of [quiet]" that night, but that sometime between 1:00 a.m. and 2:00 a.m., the Defendant wanted to show Mr. Watkins something in his car. Mr. Watkins testified that the Defendant was "a rambling mess" when they got to the Defendant's car. Mr. Watkins explained that the Defendant kept "swapping CDs out" and "plugging his phone up [and then] unplugging it."

Mr. Watkins testified that, "out of the blue," the Defendant "started talking about homeless people." Mr. Watkins recalled that the Defendant said homeless people were "scum" and "referred to himself as like a vigilante." Mr. Watkins also recalled that the Defendant said something about "just wanna shoot [motherf--kers] in the head." Mr. Watkins testified that he took the Defendant's statement as referring to homeless people. Mr. Watkins further testified that he did not believe the Defendant's statement was a joke.

Mr. Watkins testified that he got away from the Defendant as quickly as he could and told his wife not to leave him alone with the Defendant again. Mr. Watkins admitted that he did not call the police that night, but he did call the MNPD when he heard that the Defendant had been arrested for murder. Additionally, Mr. Watkins admitted that he had been drinking at the party, but he denied that he was intoxicated or that his memory was affected by the alcohol.

Mr. Watkins was also asked about a change in the Defendant's demeanor over five years before the killing when they were both still in college. Mr. Watkins recalled that the Defendant became "very quiet," that the Defendant started keeping to himself, and that the Defendant stated that he had been raped.

Geoffrey Henderson testified that he was at a birthday party with the Defendant on September 22, 2012. Mr. Henderson recalled that, "out of the blue," the Defendant said that he "had recently acquired a handgun." Mr. Henderson testified that he asked the Defendant "why would [he] need a handgun [because] there's only one purpose for a handgun." Mr. Henderson explained that he believed handguns were only used for "defense or attack." Mr. Henderson testified that the Defendant "kind of like hung his head" and responded, "Yes, you're right." Mr. Henderson further testified that neither he nor the Defendant were intoxicated during this conversation.

The Defendant admitted that he shot the victim and that it was his car seen in the surveillance footage from the Criminal Justice Center. The Defendant testified that he had been smoking marijuana on the night of October 17, 2012. The Defendant explained that he had some friends come over to his apartment to watch the television show Nashville[1] because there was a chance that he might appear as an extra on the episode. The Defendant testified that he had a "sudden emotional change" that night. The Defendant explained that he started to feel "some sort of agitation, and [that] it just increased throughout the night" causing his friends to leave "pretty abruptly."

The Defendant claimed that, after his friends left, he went downtown "to go play some cards to try to cool [his] mind" because he felt the "beginnings of a panic attack." The Defendant testified that he returned to his apartment at approximately 1:30 a.m. and that he began vomiting. The Defendant further testified that he felt "very agitated[,] very panic-stricken[,]" and "became suicidal" at that time. According to the Defendant, he took his gun and left his apartment because he was "fighting against [his] old self to not injure [him]self."

---

[1] Nashville was a "musical drama" airing from 2012 to 2018 that was filmed on location in Nashville. Nashville (2012 TV series), Wikipedia, http://en.wikipedia.org/wiki/Nashville_(2012_TV_series) (last visited Dec. 4, 2017).

The Defendant explained that he had "stopped caring about [him]self and stopped caring about other people" and that he had "decided to use the weapon" when he left his apartment. The Defendant claimed that as he drove around the Criminal Justice Center that morning, he was having "an argument" in his mind between shooting himself or shooting someone else. The Defendant also claimed that the "thought of suicide was in [his] mind" when he got out of his car.

However, the Defendant testified that when he arrived at the Criminal Justice Center, he "was pretty confident" that he "was not going to [injure] [him]self." The Defendant further testified that he "knew [he] was not going to shoot [him]self when [he] got out of the car" and that upon seeing the victim, he "knew [he] was going to shoot [the victim]." The Defendant admitted that he did not know the victim and that the victim did not move or say anything to him before he shot the victim. The Defendant denied targeting the victim because he was homeless. However, the Defendant admitted that the fact that the victim was homeless "was maybe a thought."

The Defendant testified that he went back to his apartment after shooting the victim. The Defendant claimed that he saw that the shooting "was already on the TV" and that he "knew [he] was going to be arrested at that moment." The Defendant further claimed that "an emotion came over" him and that he "knew that [he] needed to get rid of the gun." The Defendant testified that he left his apartment and threw the gun into Percy Priest Lake. The gun was never recovered. The Defendant testified that he was arrested when he returned to his apartment and that he was still feeling suicidal when he was arrested.

The Defendant testified that he was raped in 2006 and that his life had "been different ever since." The Defendant also testified that he was "really, really intoxicated" on methamphetamine when he talked to Mr. Watkins at the New Year's Eve party. The Defendant denied that he told Mr. Watkins that he was a vigilante who shot homeless people. The Defendant claimed that he told Mr. Watkins "if you're gonna worry about the welfare of a homeless man, you should be worried about shooting a homeless man."

The Defendant testified that he "was in rehab about two months" after his conversation with Mr. Watkins. The Defendant was released from rehab in April 2012, but he admitted that he started using narcotics again shortly after his release. The Defendant claimed that he got the handgun as payment for fixing someone's computer. The Defendant admitted that he told Mr. Henderson about the gun, but he denied that Mr. Henderson got angry with him or said anything to him about the gun.

Based upon the foregoing, the jury convicted the Defendant of premeditated first degree murder. The Defendant was sentenced to imprisonment for life. This timely appeal followed.

## ANALYSIS

## I. Voluntary Manslaughter

The Defendant contends that the trial court erred in excluding the testimony of expert witnesses regarding the Defendant's mental health. The Defendant also contends that the trial court erred by not instructing the jury on voluntary manslaughter. The Defendant argues that the killing was committed in "a state of passion produced by adequate provocation" due to the fact that he was suffering from a mental illness at the time of the killing and that this would have been established by the testimony of the expert witnesses. The State responds that a voluntary manslaughter instruction was not warranted by the facts of this case and that the testimony of the proposed expert witnesses was not relevant because a murder will only be reduced to voluntary manslaughter when the provocation was caused by the victim.

Prior to trial, the Defendant sought to present two expert witnesses to testify about his mental health. Both experts had concluded that there was insufficient evidence to support an insanity defense. The trial court ruled that the experts' testimony was inadmissible because neither of the experts had opined that the Defendant's mental illness negated the requisite culpable mental state for premeditated first degree murder. See State v. Hall, 958 S.W.2d 679, 690 (Tenn. 1997) (holding that "psychiatric testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect" and that "[i]t is the showing of a lack of capacity to form the requisite culpable mental intent that is central to evaluating the admissibility of expert psychiatric testimony on the issue"). One of the experts did not address the issue and the other opined that the Defendant's mental illness did not affect his ability to form the requisite culpable mental state for premeditated first degree murder.

The Defendant then sought a jury instruction on voluntary manslaughter and to have the experts' testimony admitted in order to show that he was acting under a delusion that provoked him to kill the victim. The trial court denied the Defendant's request. On appeal, the Defendant argues that his mental illness caused him to act in a state of "passion excited by inadequate provocation."

Voluntary manslaughter "is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). It has long been held under Tennessee law that a murder will only be reduced to voluntary manslaughter when the provocation was caused by the victim. See State v. Tilson, 503 S.W.2d 921 (1974); State v. Antonius Harris, No. W2001-02617-CCA-R3-CD, 2002 WL 31654814 (Tenn. Crim. App. Nov. 7, 2002); State v. Khristian Love Spann, No. 1230, 1989 WL 86566 (Tenn.

-6-

Crim. App. Aug. 3, 1989); see also Commonwealth v. LeClair, 840 N.E.2d 510 (Mass. 2006) (providing a history of the rule at common law and citing supporting cases from other jurisdictions); 40 C.J.S. Homicide § 114 (2010); 40 Am. Jur. 2d Homicide § 53 (2010).

Here, there is no evidence that the victim provoked the Defendant. The Defendant did not know the victim. The Defendant testified that the victim did not move or say anything to him prior to the killing. The victim was asleep and unarmed when the Defendant shot him in the back of the head. Based upon these facts, an instruction for voluntary manslaughter was not warranted. Additionally, we reject the Defendant's argument on appeal that voluntary manslaughter can occur when a person acts in a state of "passion excited by inadequate provocation." The voluntary manslaughter statute is clear that the state of passion must be produced by adequate provocation. The testimony of the expert witnesses was not relevant to the issue of voluntary manslaughter because the provocation must have been caused by the victim. Again, there was no evidence that the victim did anything to provoke the Defendant. Accordingly, we conclude that these issues are without merit.

## II. Defendant's Prior Statement

The Defendant contends that the trial court erred in admitting Mr. Watkins's testimony about the Defendant's statements at the New Year's Eve party. At trial, the Defendant argued that the statements were "so far removed from the [killing] in question that they [were] rendered irrelevant." On appeal, the Defendant argues that the statements were irrelevant and offered "to improperly attack the character" of the Defendant. The Defendant also argues that Mr. Watkins "was drinking" at the time he heard the Defendant make the statements and that likely affected his memory. The State responds that the trial court did not err in admitting Mr. Watkins's testimony.

Tennessee Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403. A determination regarding the relevancy of evidence "is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." State v. Biggs, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing State v. Dubose, 953 S.W.2d 649, 652 (Tenn. 1997)).

This court has long held that while "a lapse of time may . . . affect [the relevance of evidence], it is the rational connection between events, not the temporal one, that

determines whether the evidence has probative value." State v. Haun, 695 S.W.2d 546, 550 (Tenn. Crim. App. 1985). Put another way, the remoteness of the evidence goes to the weight of the evidence, not its admissibility. See State v. Smith, 868 S.W.2d 561, 575 (Tenn. 1993). Likewise, the use of alcohol by a witness affecting "the witness's ability to observe and recall the events about which he testified" would also go to the weight of the evidence rather than its admissibility. State v. Blair, 634 S.W.2d 627, 635 (Tenn. Crim. App. 1982).

Here, the Defendant told Mr. Watkins that homeless people were "scum" and described shooting them in the head on January 1, 2012. Ten months later, the Defendant shot the homeless victim in the head as he slept on a bench. These statements were highly probative on the issues of premeditation and intent. Any questions about the remoteness of the statements or Mr. Watkins's ability to correctly recall the statements went to the weight of the statements and not their admissibly.

With respect to the Defendant's argument that Mr. Watkins's testimony improperly attacked his character, the Defendant did not raise this argument at trial and makes no mention of the applicable rule, Tennessee Rule of Evidence 404(b), in his appellate brief. As such, the Defendant has waived our review of that argument. See Tenn. R. App. P. 36(a); Tenn. Ct. Crim. App. R. 10(b). Accordingly, we conclude that the trial court did not err in admitting Mr. Watkins's testimony about the Defendant's prior statements.

### III. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his conviction for premeditated first degree murder. The Defendant argues that there was insufficient evidence of premeditation because "[t]he evidence established that . . . [he] was acting under extreme emotional and psychological distress" at the time of the killing. The State responds that the evidence was sufficient to sustain the Defendant's conviction.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Premeditated first degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

> Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d) (internal quotations omitted).

The element of premeditation only requires the defendant to think "about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors determining the existence of premeditation include, but are not limited to, the following: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the killing, and calmness immediately after the killing. See State v. Davidson, 121 S.W.3d

600, 614 (Tenn. 2003); Bland, 958 S.W.2d at 660. Additional factors cited by this court from which a jury may infer premeditation include the lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

The Defendant's argument on appeal views the evidence in the light most favorable to him while ignoring the overwhelming evidence of his guilt. The Defendant referred to homeless people as "scum" and mentioned shooting them in the head to Mr. Watkins ten months prior to killing of the victim. The Defendant acquired a gun prior to the victim's killing. The Defendant drove around the Criminal Justice Center for approximately thirty minutes observing the victim before he exited his car and shot the victim in the back of the head. The victim was sleeping and unarmed when the Defendant shot him. The Defendant did not know the victim and the victim had done nothing to provoke the Defendant. The Defendant then fled the scene and threw the murder weapon in a lake. The Defendant was described as being "very calm," "very compliant," and quiet when he was arrested.

The Defendant testified that the "thought of suicide was in [his] mind" when he got out of his car. However, the Defendant testified that upon seeing the victim, he "knew [he] was going to shoot [the victim]." The Defendant also testified that he "was pretty confident" that he "was not going to [injure] [him]self" when he arrived at the Criminal Justice Center and that he "knew [he] was not going to shoot [him]self when [he] got out of the car." The Defendant further testified that the fact that the victim was homeless "was maybe a thought" he had when he shot the victim. Accordingly, we conclude that the evidence was sufficient to establish that the Defendant premeditatedly and intentionally killed the victim.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE