IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 6, 2018

**STATE OF TENNESSEE v. TORVARIUS E. MASON**

**Appeal from the Circuit Court for Haywood County**
**No. 7345       Clayburn Peeples, Judge**

————————————————————

**No. W2017-01863-CCA-R3-CD**

————————————————————

Defendant, Torvarius E. Mason, was found guilty of first degree premeditated murder and was sentenced to life imprisonment.  On appeal, Defendant argues that the trial court erred by not instructing the jury on the lesser-included offense of voluntary manslaughter and that the evidence was insufficient to support his conviction. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

William Milam, Jackson, Tennessee, for the appellant, Torvarius E. Mason.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Garry G. Brown, District Attorney General; Jason Scott and Hillary Parham, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Background*

Trudy Powell testified that on the evening of August 31, 2014, her son, Javis Powell, was at his grandmother's house on Young Street in Brownsville with his two cousins, Sadarius Delk and the victim, Jarvis Hines a.k.a. "Boosie."  She texted Mr. Powell eight or nine times, and he did not respond to her texts.  Ms. Powell began looking for her son at approximately 8:00 to 9:00 p.m.  She drove from her house to Young Street looking for him, which was approximately a ten to fifteen minute drive.  Ms. Powell found Mr. Powell on Young Street talking to Mr. Delk and "some more

guys," and she asked what he had been doing. Mr. Powell replied, "Nothing," and denied that he had been drinking. Ms. Powell approached Mr. Powell and told him that he smelled like he had been drinking so she took his car keys from him and drove away.

On her way back home, Ms. Powell saw three men standing in the parking lot of some apartments. She identified the men as Defendant, a.k.a. "Fluffy," Jermaine Turner, and Tamarius Evans, a.k.a. "Pooh-Pooh." Ms. Powell explained that the men caught her attention because "they don't stay on that side of town." She further said, "[S]o I turned around to go back to see where my nephew and them was 'cause I know they don't stay on that side of town, so I turned around and went back." As Ms. Powell was driving down Thornton Road, she saw a truck stopped in the middle of the road. She recognized the driver as Tamarius Evans. She saw Defendant run up and jump into the back of the truck, and Mr. Evans drove away. Ms. Powell drove back to Young Street. She testified:

> I got out of the car. I heard a lot of hollering and crying and I'm like, "What's going on?" They said, "Fluffy [Defendant] had just shot Boosie [the victim]." I walked over to the yard and they was holding [the victim], but when I touched him I knew he was dead. Everybody was hollering. I told them to move out [of] the way so I could see what was going on, but he was gone. When I touched him I knew he was already gone, so I just waited on the police to come.

Ms. Powell estimated that approximately five to ten minutes passed from the time that she took Mr. Powell's keys until she arrived back at Young Street.

Javis Powell testified that he was standing in Deborah Hines' yard talking on the phone at the time of the shooting. He had been on Young Street the entire day relaxing and getting ready to enjoy the holiday with family and friends. Mr. Powell, Sadarius Delk, and the victim planned to go to Jackson that night. As he was talking on the phone, Mr. Powell heard the victim talking to another cousin Deannus Hines, Deborah Hines' son, about going to Jackson. Mr. Powell said:

> . . . I just heard [the victim] say something like, "what you want, bro," and I'm like - - and he said, "Fluffy, what you want, bro?" I'm like looking around, listening. After that he didn't get to answer back. I just heard gunshots, so I ran towards my grandmother's house, Carrie, so I'm waiting on the gunshots to stop and once the gunshots stopped I run down the street where [the victim] is at across - - right diagonally across from Debra Hine's yard and he was just laying there.

Mr. Powell further testified that before the shooting the victim said, "Hey what's up bro? What you want?" He then heard another voice say, "Are you DT? You shot my brother." Mr. Powell heard gunshots and saw the fire from the gun. He did not see the

shooter. Mr. Powell testified that he and the victim knew a guy named "Fluffy" from high school. He also knew someone called "DT" (Detrio) who had been there earlier that day but was not around when the shooting occurred. Mr. Powell testified that he also heard gunshots approximately fifteen minutes before the victim was shot. He was aware that someone "in the apartments" had been shot, but he did not know who it was.

On the night of August 31, 2014, Charles Willis was working as the captain of criminal investigations of the Brownsville Police Department. He worked two shootings in the area that day. Before he could respond to the first shooting on Thomas Street, a second one occurred on Young Street. Captain Willis went to Young Street first. He said that there were a lot of people in the area, and the scene was a "little chaotic" when he arrived. The victim was still there, and an ambulance and other officers were on the scene. Four .40 caliber shell casings and a spent bullet were collected from the scene.

Sadarius Delk testified that he was on Young Street on the night of the shooting. He had planned to go to Jackson that night with the victim and Javis Powell. At some point, he heard gunshots "right up the street behind [his] grandma's house." He thought that there were one or two shots. The victim was next door at their cousin's house at the time. Mr. Delk testified that he was walking to get his car to go to Jackson when he met Defendant walking toward him. Mr. Delk said, "[A]s I met him I turned to the side and he was walking like he wanted to do something to me, so I turned to the side trying to see what he was trying to do." Mr. Delk thought Defendant was going to "fight me or hit me or something." Mr. Delk testified that Defendant then approached the victim. Mr. Delk testified that "[Defendant] stepped in the yard. [The victim] was like, "what's up, bro?" [Defendant] was like, "Which one of y'all shot my brother?" Mr. Delk testified that he saw Defendant "pointing and flames coming out of the gun." Mr. Delk added, "[A]fter that I took out to running and I ran down this way. [The victim], he was running, too, through the yard, and as he fell right here I met him right here and that's when I grabbed. He was foaming out the mouth with blood." Mr. Delk testified that he held the victim's head in his hands until the victim died.

Assistant Chief of Police Kelvin Evans of the Brownsville Police Department was assigned to investigate the shooting on Young Street. He said that Defendant's brother, Terion Taylor, was also shot that night on Thomas Street. Assistant Chief Evans testified that Mr. Taylor was shot in the groin area and recovered from his wound. However, he was later killed in an unrelated incident. Assistant Chief Evens said that the victim was never a suspect in Mr. Taylor's shooting. He noted that the initial call about the shooting on Young Street came in at approximately 10:38 p.m., and the information about the shooting on Thomas Street came in approximately ten to fifteen minutes earlier.

Assistant Chief Evans testified that Defendant was developed as a suspect in the shooting on Young Street. He prepared a photographic lineup, and Defendant was

identified by several witnesses as the shooter. Assistant Chief Evans obtained a warrant for Defendant's arrest, and he turned himself in to authorities on September 4, 2014.

On cross-examination, Assistant Chief Evans estimated that it would probably take "less than three or four minutes" to get from the scene of the shooting on Thomas Street to the scene on Young Street. Assistant Chief Evans testified that he was unable to develop a suspect in the shooting of Terion Taylor on Thomas Street. He said:

> The first shooting on Thomas Street, it was very dark behind the apartments and all the witnesses were people who heard shots but didn't see anything, not even a clothing description or anything. They just heard shots.

Dr. Karen Chancellor, Chief Medical Examiner for Shelby County, testified that she performed an autopsy on the victim on September 1, 2014. She opined that the "manner of death is homicide and the cause is the gunshot wound to the back." Dr. Chancellor described the various wounds to the victim's body. She testified that one gunshot wound entered the victim's back "about the midline and that bullet went through the right lung and through the superior vena cava, which is one of the largest blood vessels in the body." Another gunshot wound passed through the victim's left thigh and "came out the front of thigh." There was a third wound on the back of the victim's left knee "where the bullet entered and that bullet went downward and exited on the back of the leg near the left ankle." Dr. Chancellor described a fourth gunshot wound to the back of the victim's right thigh as superficial. A fifth gunshot wound was a "graze wound" to the victim's left shoulder. Dr. Chancellor testified that the victim's most serious wound was the one that went through the victim's back and struck the victim's lung and superior vena cava.

*Analysis*

## I.     Jury Instruction

Defendant asserts that the trial court erred by not instructing the jury on the offense of voluntary manslaughter as a lesser-included offense of first degree murder. Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a). Voluntary manslaughter is a lesser-included offense of first degree murder under part (b) of the test provided in *State v. Burns*, 6 S.W.3d 453 (Tenn. 1999); T.C.A. § 40-18-110(g)(2).

A criminal defendant has "a right to a correct and complete charge of the law." *Hanson*, 279 S.W.3d at 280 (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000)). As a result, a trial court has a duty "to give proper jury instructions as to the law

governing the issues raised by the nature of the proceeding and the evidence introduced at trial." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (citing *Dorantes*, 331 S.W.3d at 390); *see State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975).

When a party fails to make a written request for a lesser included offense instruction, a trial court may still instruct a jury on the offense. *Bryant v. State*, 460 S.W.3d 513, 523 (Tenn. 2015). A party, however, is "not entitled to such an instruction." *Id.*; see *State v. Fayne*, 451 S.W.3d 362, 370-71 (Tenn. 2014). A defendant's failure to request an instruction for a lesser included offense results is waiver of the lesser included instruction. T.C.A. § 40-18-110(c). Furthermore, "[a]bsent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief either in a motion for a new trial or on appeal." *Id.*

The record does not contain a written request from the Defendant for an instruction on lesser included offenses. At the conclusion of the State's case, Defendant made an oral motion for judgment of acquittal, which was denied. The following exchange took place at trial:

| [Prosecutor]: | I need to address the pre-trial motion of the case law as to whether or not - - |
|---|---|
| THE COURT: | Can you hear this? I believe that - - I'm presuming you're not going to present any evidence. |
| [Defense Counsel]: | No evidence, Your Honor. |
| THE COURT: | No evidence whatsoever that there is anything by the victim that was provocative – any provocative act by a third party. I don't think there's – if you take the evidence at all that the victim had even a tangential or inconsequential part provoking his death, I think – I think- I don't see any way possible that any kind of court would say this is a voluntary manslaughter, so I'm not going to charge voluntary manslaughter. |
| [Defense Counsel]: | (Inaudible). |
| THE COURT: | I think there are more cases than the General actually gave us this morning. I think that - - I |

- 5 -

|  | don't think Tennessee law allows me to do that so I'm not going to. |
| --- | --- |
| [Defense Counsel]: | (Inaudible). |
| THE COURT: | I've ruled. |

Later on before the jury charge was read, the trial court noted: "[Defense counsel], I know you objected to voluntary manslaughter not being there, but other than that, is it correct?" Therefore, this issue is waived for failure to file a written request.

In any event, even if not waived, Defendant was not entitled to a jury instruction on voluntary manslaughter. There was no evidence to show that Defendant killed the victim while "in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Although Defendant was looking for the person who shot his brother a short time earlier that night, there was absolutely no proof in the record that the victim was involved in the shooting. A panel of this court has held:

> The elements which distinguish voluntary manslaughter from murder are those of "adequate provocation" and the "state of passion." It has long been held under Tennessee law, and at common law, that a murder will only be reduced to voluntary manslaughter when the provocation was caused by the victim. *See State v. Tilson*, 503 S.W.2d 921 (Tenn. 1974); *State v. Chris Jones*, No. W2009-01698-CCA-R3-CD, 2011 WL 856375, at *11 (Tenn. Crim. App. Mar. 9, 2011); *State v. Antonius Harris*, No. W2001-02617-CCA-R3-CD, 2002 WL 31654814 (Tenn. Crim. App. Nov. 7, 2002); *State v. Khristian Love Spann*, No. 1230, 1989 WL 86566, at *7 (Tenn. Crim. App. Aug. 3, 1989*); see also Commonwealth v. LeClair*, 840 N.E.2d 510 (Mass. 2006) (providing a history of the rule at common law and citing supporting cases from other jurisdictions); 40 C.J.S. Homicide § 114 (2010); 40 Am. Jur. 2d Homicide § 53 (2010).
>
> The Tennessee Supreme Court first addressed this issue in *Tilson*, where the defendant in *Tilson* had been involved in a barroom brawl with several men prior to leaving the bar. 503 S.W.2d at 921-22. The defendant returned a short time later with a pistol and shot the victim who had taken no active part in the fight but had been "on the side" of the one provoking the fight. *Id*. at 923-24. Our supreme court held that the defendant's actions did not constitute voluntary manslaughter because he killed an unarmed man who was simply "on the side" of the person who provoked an earlier fight with the defendant. *Id.* Similarly,

in a more recent decision, this court held that there was insufficient evidence to support a defendant's claim of adequate provocation when the defendant had kidnapped several people and was shot by one of the victims before he "shot his unarmed victim whom he had been holding at gunpoint and who had done nothing to provoke the defendant." *Harris*, 2002 WL 31654814, at *12-13.

*State v. Benesch*, No. M2015-02124-CCA-R3-CD, 2017 WL 3670196, at *17 (Tenn. Crim. App. Aug. 25, 2017).

Likewise in this case, the unarmed victim did nothing to provoke Defendant before Defendant shot him five times, killing him. Defendant was not entitled to a jury instruction on voluntary manslaughter.

## II.     Sufficiency of the Evidence

Defendant argues that the evidence is insufficient to sustain his conviction for premeditated first degree murder. Defendant argues that there is insufficient evidence to sustain his conviction because the State failed to establish that he acted with premeditation because there was no preparation by Defendant and that he was "filled with passion at the moment of the shooting." He further asserts that he believed the victim to be armed. The State responds that the evidence presented was sufficient to sustain Defendant's conviction. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009) (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005); *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)

(quoting *Hanson*, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell,* 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)).

First degree murder is defined as "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a).

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

T.C.A. § 39-13-202(d).

The element of premeditation is a factual question to be decided by a jury from all the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Although a jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. *Bland*, 958 S.W.2d at 660. Our supreme court has held that factors demonstrating the existence of premeditation include, but are not limited to, the following: the declaration of the intent to kill, the procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, the infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, the destruction or secretion of evidence, and calmness immediately after the killing. *State v. Jackson*, 173 S.W.3d 401, 409 (Tenn. 2005); *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000). Additional factors cited by this court from which a jury may infer premeditation include lack of provocation by the victim and the defendant's failure to render aid to the victim. *See State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). Further, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004) (citing *State v. Nesbit*, 978 S.W.2d 872, 898 (Tenn. 1998)).

We conclude that the evidence viewed in the light most favorable to the State proves that the killing was premeditated. Defendant's brother was shot ten to fifteen

minutes before the victim was shot and killed. Defendant and two of his friends then went looking for the person who shot his brother. Defendant was armed and clearly had the intent to kill the victim when he walked up to the unarmed victim and shot him five times, including as the victim fled. Although there was testimony by Sadarious Delk that Defendant appeared "aggressive" and upset, there was absolutely no proof that the victim did anything to provoke the shooting and no proof that the victim was involved in the shooting of Defendant's brother. The witnesses testified that when Defendant walked up the victim said, "Hey what's up bro? What you want?" Javis Powell then heard another voice say, "Are you DT? You shot my brother." It appears from the testimony that Defendant did not give the victim time to respond before he shot the victim. After the shooting, Defendant fled the scene in the back of a truck driven by Tamarius Evans. He did not turn himself into police until four days later.

The proof is sufficient beyond a reasonable doubt to support Defendant's conviction for premeditated first degree murder. Therefore, Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE